Affirmed by Supreme Court on January 19, 2000.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LONNIE WEEKS, JR.,
<u>Petitioner-Appellant,</u>

v.

No. 98-21

RONALD J. ANGELONE, Director of
the Virginia Department of
Corrections,
<u>Respondent-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca B. Smith, District Judge.
(CA-96-829-2)

Argued: March 1, 1999

Decided: May 10, 1999

Before WILKINSON, Chief Judge, and HAMILTON and
WILLIAMS, Circuit Judges.

_____

Application for a certificate of appealability denied and petition dis-
missed by published opinion. Judge Williams wrote the opinion, in
which Chief Judge Wilkinson and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Timothy Meade Richardson, HUFF, POOLE &
MAHONEY, P.C., Virginia Beach, Virginia, for Appellant. Robert H.
Anderson, III, Assistant Attorney General, OFFICE OF THE

ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Glen A. Huff, HUFF, POOLE & MAHONEY, P.C., Virginia Beach, Virginia; Sterling H. Weaver, Sr., Portsmouth, Virginia, for Appellant. Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

On October 21, 1993, a Commonwealth of Virginia jury convicted Lonnie Weeks, Jr., of the capital murder of Virginia State Trooper Jose Cavazos. Following the jury's determination that Weeks's conduct satisfied the "vileness" aggravating factor, the trial court sentenced Weeks to death. After exhausting all available state remedies, Weeks petitioned the United States District Court for the Eastern District of Virginia for habeas corpus relief. See 28 U.S.C.A. § 2254 (West 1994 & Supp. 1998). The district court dismissed his petition. Weeks subsequently filed an application for a certificate of appealability with this Court raising numerous constitutional claims of error. Weeks argues, inter alia, that the trial court's refusal to clarify its capital sentencing instruction to the jury after they indicated confusion with the instruction prevented the consideration of relevant mitigating evidence in violation of the Eighth and Fourteenth Amendments, that the trial court's refusal to appoint ballistics and pathology experts violated his due process rights under the Fourteenth Amendment, and that the Supreme Court of Virginia's refusal to suppress his confession to the murder of Trooper Cavazos violated his Fifth and Fourteenth Amendment rights. After reviewing the record and briefs and hearing oral argument, we conclude that Weeks has failed to make "a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(2) (West Supp. 1998). Accordingly, we deny his application for a certificate of appealability and dismiss his petition.

I.

The undisputed facts of this case, as recited by the Supreme Court of Virginia, are as follows:

2

In early February 1993, [Weeks], who was age 20, a North Carolina resident, and on probation for a 1992 drug conviction, participated in the burglary of a residence in the Fayetteville, North Carolina area. During the course of that crime, [Weeks] obtained a set of keys to a 1987 Volkswagen Jetta automobile parked at the residence, and stole the vehicle. Later that month, [Weeks] drove the vehicle to Washington, D.C., intending to sell it or trade it for drugs. [Weeks] carried in the vehicle a Glock Model 17, nine millimeter, semi-automatic pistol loaded with hollow-point bullets. According to the testimony, the bullets were designed for police use, not target practice or hunting; this type of bullet is referred to as a "man stopper."

During the late evening of February 23, [Weeks] was riding as a passenger in the vehicle being driven by his uncle, 21-year-old Lewis J. Dukes, Jr., a resident of the District of Columbia. The pair was traveling en route from Washington to Richmond southbound on Interstate Route 95.

Around midnight, Trooper Cavazos was operating radar from his marked police vehicle parked in the highway medium monitoring southbound traffic. The Volkswagen driven by Dukes passed the trooper's position at a high rate of speed. The officer activated his vehicle's emergency lights and proceeded to chase the vehicle occupied by [Weeks]. After traveling a brief distance, and passing other vehicles by driving on the right shoulder of the highway, Dukes brought the car to a stop on the Dale City exit ramp, in a dark, remote area.

The trooper pulled his patrol car to a stop behind the Volkswagen, which he approached on foot on the driver's side. Upon the officer's request, Dukes alighted and was standing toward the left rear of the Volkswagen when the trooper asked [Weeks] to step out of the vehicle.

[Weeks] complied with the officer's request and alighted on the right side of the vehicle as the trooper was near the left side. As [Weeks] left the vehicle he was carrying the

3

fully loaded pistol. He then fired at least six bullets at the officer, two of which entered his body beside the right and left shoulder straps of the protective vest the trooper was wearing. The officer was immediately rendered unconscious and fell to the pavement, dying within minutes at the scene with his police weapon in its "snapped" holster.

[Weeks], with Dukes as a passenger, then drove the Volkswagen from the scene and parked it on the lot of a nearby service station. [Weeks] returned to the scene of the crime on foot and retrieved Dukes' District of Columbia driver's license that had been dropped on the pavement. [Weeks] rejoined Dukes, and they were found by police shortly thereafter in the parking lot of a nearby motel.

. . .

About 2:45 a.m., after [Weeks] had been with [the Prince William County police officer who had first encountered Weeks in the motel parking lot] for about two hours, state police officers arrived to question [Weeks] and Dukes. Near 3:00 a.m., state police Special Agent J.K. Rowland met [Weeks] in the motel lobby. Rowland "explained to him that he was not under arrest" and asked [Weeks]"if he would like to talk . . . about what he had seen up on Interstate 95." [Rowland], who . . . testified [that Weeks] was "free to leave at that time," conducted an interview with [Weeks] in private in one of the motel rooms.

. . .

[A]s Rowland questioned [Weeks] in the motel room, Rowland became "more and more suspicious" of[Weeks]. Even though [Weeks] "was free to leave" at that point, Rowland advised [Weeks] of his constitutional rights according to Miranda v. Arizona, 384 U.S. 436 (1966), as a precaution at 7:40 a.m. [Weeks] then exercised his right to remain silent and wrote, "Do not want to discuss case any further," on the "Advice of Rights" form that he signed. Rowland honored this request, and ceased questioning.

4

At 7:50 a.m., Rowland was advised by another investigator that Dukes had just stated that [Weeks] shot the trooper. Rowland arrested [Weeks] at 7:52 a.m.

Subsequently, [Weeks] was taken before a magistrate and then to the Adult Detention Center in Manassas. Later that morning, classification officers in the jail routinely questioned [Weeks] about his physical and mental state; no attempt was made to elicit information about the crime. During the interview, [Weeks] indicated that he was considering suicide because he had shot the trooper. [Weeks] also voluntarily wrote a letter to a jail officer admitting the killing and expressing remorse. [Weeks] does not contest either of these admissions but attacks the constitutional validity of the following interview.

Near 6:00 p.m. on February 24, [Weeks] was brought to the lounge of the local prosecutor's office where Rowland again interviewed him; additional information had been developed by the police during the day between the termination of the first interview and the beginning of the second interview. Rowland asked [Weeks], "Do you remember the rights I read to you earlier today?" to which [Weeks] responded affirmatively. Rowland proceeded "to summarize the investigation through the course of the day's events to that point in time."

Among other things, Rowland told [Weeks] that an eyewitness to the shooting had made a positive identification of him as the assailant. A witness actually had identified [Weeks] as a person she saw at the scene after the homicide, but she had not witnessed the shooting. At the conclusion of Rowland's summary, he said to [Weeks], "This is your opportunity to provide your explanation as to what happened at the shooting scene." [Weeks] responded, "Yes, I was packing." The officer knew that "packing" meant "carrying a firearm."

[Weeks] then confessed to the trooper's murder. [Weeks] stated that when the trooper asked him to get out of the

5

Volkswagen, he picked up the pistol and "thought about throwing it away." Instead, he saw the trooper put his hand down toward his service revolver. [Weeks] said he then "panicked" and shot the victim "several times rapidly." [Weeks] stated that he drove, with Dukes as a passenger, to the service station, placing the pistol under the front floor mat of the Volkswagen. This interview lasted about one hour during which [Weeks] readily answered questions and did not invoke his right to remain silent or any other constitutional right.

Weeks v. Commonwealth, 450 S.E.2d 379, 382-86 (Va. 1994).

After a jury trial in the Circuit Court of Prince William County, Virginia, Weeks was convicted of the capital murder of Cavazos pursuant to Va. Code Ann. § 18.2-31(6) (Michie Supp. 1998).[1] Based on its finding -- made during the sentencing phase of Weeks's trial -- that Weeks's conduct was outrageously or wantonly vile in that it involved depravity of mind and/or aggravated battery to the victim beyond the minimum necessary to commit the murder, see Va. Code. Ann. § 19.2-264.4(C) (Michie 1995), the jury recommended that Weeks be sentenced to death. After conducting a post-trial hearing pursuant to Va. Code. Ann. § 19.2-264.5 (Michie 1995), the Circuit Court of Prince William County followed the jury's recommendation and sentenced Weeks to death. On direct appeal, the Supreme Court of Virginia upheld Weeks's conviction and death sentence. See Weeks, 450 S.E.2d 379. The Supreme Court of the United States denied Weeks's petition for a writ of certiorari. See Weeks v. Virginia, 116 S. Ct. 100 (1995).

Weeks requested that the Circuit Court of Prince William County appoint counsel to assist him in preparing a state habeas petition. On October 10, 1995, the circuit court granted this request and Weeks's state habeas counsel filed a petition for habeas corpus. On December

_____

[1] Weeks also pleaded guilty to the use of a firearm in the commission of a murder and a related grand larceny charge, pursuant to Va. Code Ann. §§ 18.2-53.1 and 18.2-95 (Michie 1996 & Supp. 1998), respectively, for which he was sentenced to a total of thirteen years in prison. These charges are not at issue on appeal.

6

1, 1995, state habeas counsel withdrew the petition from the circuit court after learning on that day that the appropriate court with which to file the petition was the Supreme Court of Virginia, because that court has sole jurisdiction over habeas petitions in death-sentence cases. State habeas counsel immediately mailed the petition by regular mail to the Supreme Court of Virginia on December 1, the last day for filing. The petition was filed on December 4, 1995.

On January 11, 1996, the Commonwealth filed a motion to dismiss Weeks's petition as jurisdictionally barred due to untimeliness under Va. Code § 8.01-654.1 and Rule 5:7A(a) of the Rules of the Supreme Court of Virginia. In its motion, the Commonwealth argued that the petition was not timely filed because the Supreme Court of Virginia does not accept pleadings sent in the mail on the last day for filing unless they are sent by certified or registered mail. On that same day, the Commonwealth also filed a motion to dismiss the petition on substantive grounds. On March 15, 1996, the Supreme Court of Virginia dismissed the petition as jurisdictionally barred due to untimeliness.

On April 11, 1996, Weeks filed a petition for rehearing with the Supreme Court of Virginia. Weeks subsequently filed a purportedly pro se motion seeking the dismissal of his state habeas attorney for an alleged conflict of interest and leave to file a second habeas petition after the appointment of new counsel. That motion was denied by the Supreme Court of Virginia on May 31, 1996. One week later, on June 7, 1996, the Supreme Court of Virginia denied Weeks's petition for rehearing. On June 28, 1996, the Circuit Court of Prince William County entered an order setting Weeks's execution for August 19, 1996.

On August 14, 1996, Weeks filed a motion in the United States District Court for the Eastern District of Virginia requesting appointment of counsel, a stay of execution, and leave to proceed in forma pauperis. These motions were granted. Weeks was ordered to file his petition for writ of habeas corpus on or before February 7, 1997.

Weeks submitted his petition for a writ of habeas corpus in the district court on February 7, 1997. The matter was referred to a magistrate judge for the preparation of a report and recommendation pursuant to 28 U.S.C.A. § 636(b)(1)(B) and (C) (West 1993) and Rule

7

72(b) of the Federal Rules of Civil Procedure. On July 30, 1997, the magistrate judge filed a report and recommendation, recommending that the petition be denied and dismissed. By opinion and final order of April 1, 1998, the district court granted the Commonwealth's motion for summary judgment and denied and dismissed Weeks's petition for a writ of habeas corpus in its entirety. Weeks v. Angelone, 4 F. Supp.2d 497 (E.D. Va. 1998). On April 15, 1998, Weeks moved to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). The district court denied this motion on June 19, 1998. On July 17, 1998, Weeks filed a timely notice of appeal. On October 16, 1998, Weeks filed an application for a certificate of appealability with this Court pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

On appeal, Weeks contends that he is entitled to habeas relief on the following grounds: (1) the trial court's failure to instruct the jury clearly that they were obliged to consider relevant mitigating evidence before making their sentencing determination created a reasonable probability that the jury interpreted the sentencing instructions in a way that prevented the consideration of constitutionally relevant evidence; (2) the trial court's refusal to appoint ballistics and pathology experts deprived him of his constitutional rights; (3) the trial court's failure to suppress evidence derived in violation of his Fifth Amendment right against self-incrimination deprived him of due process; (4) Rule 5:25 is not an adequate procedural bar to his claims that were not raised at trial; (5) the fifty-page brief limit imposed by the Supreme Court of Virginia excuses the procedural default of claims not briefed on direct appeal; and (6) his state habeas counsel's conflict of interest constituted a violation of due process that excused the procedural default of his ineffective-assistance-of-trial-counsel claims. We address Weeks's arguments in turn.

II.

The parties agree that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, governs this case.**2** For a claim that was adjudicated on the merits in state

_____

**2** The AEDPA prohibits federal habeas relief on any claim "adjudicated on the merits in State court proceedings," unless that adjudication

8

court proceedings, this Court will not issue a writ of habeas corpus under the AEDPA unless (a) the state court decision is in "square conflict" with Supreme Court precedent that is controlling as to law and fact or (b) if no such controlling decision exists,"the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant [S]upreme [C]ourt precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts." Green v. French, 143 F.3d 865, 870 (4th Cir. 1998). "In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." Id. When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, however, our review of questions of law and mixed questions of law and fact is de novo. See Jones v. Jones, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying pre-AEDPA de novo standard of review to claims of ineffective assistance of counsel that were properly raised, but not adjudicated on merits in state court).

III.

First, Weeks argues that the trial court prevented the jury from considering relevant mitigating evidence in violation of Boyde v. California, 494 U.S. 370 (1990). Specifically, Weeks points to the failure of the trial court, in response to a specific jury request for clarification, to instruct the jury clearly that it was not required to sentence Weeks to death upon finding at least one aggravating factor. In Boyde, the Supreme Court held that the proper inquiry into whether capital jury instructions satisfy the Eighth Amendment requirement that a sentencer give effect to mitigating evidence is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id. at 380.

_____

resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West Supp. 1998).

9

A.

During the penalty phase of Weeks's trial, the trial court gave the jury a lengthy sentencing instruction (Instruction #2).**3** The trial court denied Weeks's proffered instruction, C1, which instructed the jury that it had the option to give effect to the mitigating evidence and sentence Weeks to life in prison even if it found the Commonwealth had proved one or both of the aggravating factors beyond a reasonable

_____

**3** Instruction #2 read as follows:

> You have convicted the defendant of an offense which may be punished by death. You must decide whether the defendant shall be sentenced to death or to imprisonment for life or to imprisonment for life and a fine of a specific amount, but not more than $100,000. Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt at least one of the following two alternatives:

> 1. That, after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society; or

> 2. That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.

> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt either of the two alternatives, and as to that alternative you are unanimous, then you may fix the punishment of the defendant at death or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the defendant at life imprisonment or imprisonment for live [sic] and a fine of a specific amount, but not more than $100,000.00.

> If the Commonwealth has failed to prove beyond a reasonable doubt at least one of the alternatives, then you shall fix the punishment of the defendant at life imprisonment or imprisonment for live [sic] and a fine of a specific amount, but not more than $100,000.00.

(J.A. at 264.)

10

doubt. During its penalty phase deliberations, the jury asked the court whether it was their duty to issue the death penalty if they found that Weeks was guilty of one of the aggravating factors, or whether they must decide whether or not to issue a death sentence even after finding that one of the aggravating factors had been met. Rather than issuing a clarifying instruction, the trial court instructed the jury by written response to see the second paragraph of Instruction #2, which read as follows:

> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt either of the two alternatives, and as to that alternative you are unanimous, then you <u>may</u> fix the punishment of the defendant at death or if you believe from all the evidence that the death penalty is not justified, then you <u>shall</u> fix the punishment of the defendant at life imprisonment or imprisonment for live [sic] and a fine of a specific amount, but not more than $100,000.00.

(J.A. at 264 (emphases added).) The trial court overruled Weeks's objection and request that the jury be instructed that it could impose a life sentence upon finding one or both aggravating factors based upon its belief that the jurors "just have to be drawn to that paragraph to find their answer." (J.A. at 1344.) Following several more hours of deliberation, the jury sentenced Weeks to death.

The Supreme Court of Virginia rejected Weeks's claim, contained in assignment of error no. 44, that the trial court's actions prevented the jury from considering relevant mitigating evidence on the ground that Weeks "effectively presents no argument in support of" his claim. <u>Weeks v. Commonwealth</u>, 450 S.E.2d 379, 383 (Va. 1994). The Commonwealth argues that this dismissal is procedural and that Weeks has procedurally defaulted any objection to the trial court's response to the jury's question about its sentencing options.

We disagree with the Commonwealth's characterization. First, in the sentence at the end of the same paragraph that states that Weeks "effectively presents no argument in support of," <u>inter alia</u>, assignment of error no. 44, the Supreme Court of Virginia concluded, "We have considered these so-called arguments and <u>find no merit</u> in any of [them]." <u>Id.</u> (emphasis added). Second, the Supreme Court of Vir-

11

ginia stated the following near the end of its opinion: "[D]efendant raises a number of miscellaneous issues dealing with evidence, jury instructions, and inquiries by the jury during its deliberations. We have considered all the arguments in support of these issues and conclude that none has any merit." Id. at 390 (emphasis added). Because Weeks's jury made two inquiries and Weeks's brief to the Supreme Court of Virginia made two assignments of error (nos. 43 and 44) regarding the court's response to jury instructions, the Supreme Court of Virginia's use of the term "inquiries," must have referred to both assigned errors nos. 43 and 44. The Supreme Court of Virginia therefore adjudicated assigned error no. 44 on the merits, allowing us to review this claim in a federal habeas proceeding. **4** See Wright v. Angelone, 151 F.3d 151, 156-57 (4th Cir. 1998) (holding that a perfunctory decision constitutes an adjudication on the merits).

Where, as here, the state supreme court has adjudicated a claim on the merits but has given no indication of how it reached its decision, a federal habeas court must still apply the AEDPA standards of review. See id. A state court's perfunctory decision is reasonable if it "`is at least minimally consistent with the facts and circumstances of the case.'" Id. at 157 (quoting Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir.), cert. denied, 118 S. Ct. 72 (1997)). Therefore, the writ will not issue unless we determine that the Supreme Court of Virginia's disposition of this claim was either contrary to federal law as determined by the Supreme Court or an application or interpretation of Supreme Court precedent "that reasonable jurists would all agree," Green v. French, 143 F.3d 865, 870 (4th Cir. 1998), was not "`minimally consistent with the facts and circumstances of the case,'" Wright, 151 F.3d at 157 (quoting Hennon, 109 F.3d at 335).

B.

The Eighth Amendment requires that a capital jury be able to consider and give effect to all relevant mitigating evidence offered by the petitioner. See Eddings v. Oklahoma, 455 U.S. 104, 112-14 (1982); Lockett v. Ohio, 438 U.S. 586, 604 (1978). Evidence about the peti-

_____

**4** The district court also concluded that the Supreme Court of Virginia dismissed this claim on the merits. See Weeks v. Angelone, 4 F. Supp.2d 497, 536 (E.D. Va. 1998).

tioner's background and character is necessary for the sentencer "to make an individualized assessment of the appropriateness of the death penalty." Penry v. Lynaugh, 492 U.S. 302, 319 (1989). In determining the validity of a challenged instruction, the instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 147 (1973). In Boyde, 494 U.S. 370, the Supreme Court fleshed out these principles, holding that the proper inquiry in cases where a capital sentencing instruction allegedly prevents the consideration of mitigating evidence is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id. at 380. Applying this rule to the petitioner's case in Boyde, the Supreme Court concluded that there was not a reasonable likelihood that the challenged instruction prevented the consideration of mitigating evidence, in light of the fact that the instruction told the jury that "you shall" consider "[a]ny other circumstance which extenuates the gravity of the crime" and that the jury was presented with four days of evidence at the penalty phase relating to Boyde's background and character. Id. at 381; see id. at 381-84.

Applying the Boyde inquiry in Buchanan v. Angelone, 118 S. Ct. 757 (1998), the Supreme Court upheld the constitutionality of the Virginia pattern capital sentencing instruction, the very instruction at issue in this case, against a challenge on Eighth and Fourteenth Amendment grounds. The Supreme Court first noted that "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. However, the State may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." Buchanan, 118 S. Ct. at 761 (internal citations omitted). The Court further held, in pertinent part:

> The instruction did not foreclose the jury's consideration of any mitigating evidence. By directing the jury to base its decision on "all the evidence," the instruction afforded jurors an opportunity to consider mitigating evidence. The instruction informed the jurors that if they found the aggravating factor proved beyond a reasonable doubt then they "may fix" the penalty at death, but directed that if they

13

believed that all the evidence justified a lesser sentence then they "shall" impose a life sentence. The jury was thus allowed to impose a life sentence even if it found the aggravating factor proved.

Id. at 762. The Supreme Court concluded that"[e]ven were we to entertain some doubt as to the clarity of the instructions," the two days of testimony related to mitigating evidence and the extensive arguments of the defense and the prosecution on the effect such evidence should be given in the sentencing determination demonstrated that there was "not a reasonable likelihood" that the instructions had precluded the jury's consideration of Buchanan's mitigating evidence in violation of Boyde. Id. at 762-63.

Given the Supreme Court's decision in Buchanan , Weeks is reduced to arguing that the trial court's failure to clarify a constitutionally sufficient instruction violated his Eighth and Fourteenth Amendment rights because the jury's question placed the trial court on notice that it was reasonably likely that the jury would apply the instruction in a way that prevented the consideration of mitigating evidence. We find this argument to be without merit. Following the jury's finding of guilt on the capital murder charge, Weeks presented mitigating evidence as to his religious upbringing, the abrupt manner in which the events surrounding the shooting unfolded, and his feelings of remorse. Defense counsel argued extensively that the jury should give this mitigating evidence great weight in the sentencing determination. "[W]e think it unlikely that reasonable jurors would believe the court's instructions transformed all of this favorable testimony into a virtual charade." Boyde, 494 U.S. at 383 (internal quotation marks omitted). In fact, the verdict form the jury returned specifically noted that in fixing Weeks's punishment at death, the jury "considered the evidence in mitigation of the offense." (J.A. at 258, 1345-46.) At the conclusion of the penalty phase, following the announcement of the verdict in open court, each member of the jury was polled and confirmed the verdict.

Under these circumstances, we believe that no reasonable juror would have understood the sentencing instruction to preclude the consideration of mitigating evidence even upon a finding of an aggravating factor. The Supreme Court of Virginia's summary disposition of

14

this claim, therefore, was neither contrary to federal law as interpreted by the Supreme Court of the United States nor an application or interpretation of Boyde "that reasonable jurists would all agree," Green, 143 F.3d at 870, was not "minimally consistent with the facts and circumstances of the case," Wright, 151 F.3d at 157.[5]

IV.

Next, Weeks argues that the trial court's denial of his request for appointed ballistics and pathology experts violated his rights under the Fourteenth Amendment.[6] As support for his argument, Weeks cites the Supreme Court of Virginia's opinion in Husske v. Commonwealth, 476 S.E.2d 920 (Va. 1996), cert. denied, 117 S. Ct. 1092 (1997), decided one year after Weeks's conviction became final. In Husske, the Supreme Court of Virginia held that in certain instances, indigent defendants must be provided with non-psychiatric experts as part of the "basic tools of an adequate defense." Id. at 925.

A.

Prior to the trial, Weeks filed a motion for expert assistance in the fields of ballistics and pathology and, simultaneously, asked that his motion be treated pursuant to 18 U.S.C.A. § 3006A(e) (West Supp. 1998), which requires that an indigent's request for expert assistance in federal court be treated ex parte. Weeks contended that expert assistance was needed to evaluate the evidence and present a defense on the issues of premeditation in the guilt phase and vileness in the sentencing phase. Weeks contended that because he must demonstrate to the court why such expert assistance is required, the hearing on the motion should be ex parte to prevent the prosecution from learning

_____

[5] Even if we were to apply the pre-AEDPA standard of de novo review, see Howard v. Moore, 131 F.3d 399, 406 (4th Cir. 1997) (en banc), cert. denied, 119 S. Ct. 108 (1998), we would conclude, for the reasons discussed, that the trial court's actions did not prevent the jury's consideration of mitigating evidence in violation of Boyde.

[6] Because Weeks frames this issue in his brief in terms of the fairness of the trial he received, we utilize a due process analysis in addressing his claim. See Moore v. Kemp, 809 F.2d 702, 709 n.6 (11th Cir. 1987) (en banc).

15

the theory of the defense. After hearing argument of counsel, the trial court entered an order of September 28, 1993, denying both the motion and Weeks's request for an ex parte hearing on the motion.

On direct appeal, Weeks raised numerous assignments of error. In his 11th assignment of error, Weeks argued that the trial court erred by denying his application to be heard ex parte on his motion for expert assistance in the fields of pathology and ballistics. In his 12th assignment of error, Weeks argued that the trial court erred by denying his motion for expert assistance in the field of pathology and ballistics. The Supreme Court of Virginia declined to grant relief on either claim. See Weeks v. Commonwealth, 450 S.E.2d 379, 388 (Va. 1994).

The Commonwealth argues that the Supreme Court of Virginia's disposition of Weeks's 12th assignment of error, i.e., his claim for appointment of experts, is not cognizable on federal habeas because it "reached no federal constitutional issue, for the simple reason that Weeks advanced no such claim." (Appellee's Br. at 16-17.) A federal court may grant habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a) (West 1994). Therefore, when a petitioner's claim rests solely upon an interpretation of state case law and statutes, it is not cognizable on federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Moreover, a federal habeas court cannot hear a petitioner's federal claims unless he has first exhausted state remedies, see 28 U.S.C.A. § 2254(b), (c) (West 1994 & Supp. 1998), which requires that the petitioner fairly present the substance of his federal claim to the state courts, see Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) (reversing grant of writ of habeas corpus where petitioner, on direct appeal in state court, claimed that evidentiary ruling violated state law but did not claim violation of any federal constitutional right).

Applying these principles to the facts of this case, we find the Commonwealth's argument unpersuasive. Although the Commonwealth correctly noted that the Supreme Court of Virginia did not discuss a federal constitutional issue in addressing Weeks's claim, it is

16

the petitioner's argument to the court rather than the court's decision that is dispositive. Weeks's brief on direct appeal clearly alleged that the denial of expert assistance constituted violations of the Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States. Because Weeks presented the substance of a federal constitutional claim for experts to the Supreme Court of Virginia, we may review this claim in a federal habeas proceeding.

B.

Weeks argues that the Supreme Court of Virginia never adjudicated the merits of his claim, and, therefore, this Court must review it de novo. Specifically, Weeks alleges that the Supreme Court of Virginia dismissed his application for an ex parte hearing on his motion for expert assistance in the fields of pathology and ballistics, the 11th assignment of error, without addressing his actual request for such expert assistance, the 12th assignment of error. With regard to these two assignments of error, the Supreme Court of Virginia found the following:

> Associated with defendant's claim of error relating to the request for a scientific investigation is the complaint that the trial court erred by denying his request to be heard ex parte on his motion for expert assistance in the fields of pathology and ballistics, and for denial of the request for appointment of such experts. Defendant asked that his motion for funding for expert assistance "be treated under the same procedure as required by Title 18 USC 3006A(e) in Federal Court." There is no merit to this contention.
>
> We already have decided that a defendant charged with capital murder is not entitled to an ex parte hearing on his motion for expert assistance. Ramdass v. Commonwealth, 246 Va. 413, 422, 437 S.E.2d 566, 571 (1993), rev'd on other grounds sub nom. Ramdass v. Virginia, ___ U.S. ___, 114 S. Ct. 2701, 129 L.Ed.2d 830 (1994). In addition, we specifically have refused to apply the federal statute to state capital murder prosecutions.

Weeks, 450 S.E.2d at 388. Weeks's claim rests on the arguable point that when the Supreme Court of Virginia stated that"[t]here is no

17

merit to this contention," the singular term "this contention" only referred to Weeks's application for an ex parte hearing and not to his claim for experts. Weeks's interpretation is supported by the preceding sentence, in which the Supreme Court of Virginia ruled that Weeks asked that his request for an ex parte hearing be treated under the same procedure as required by 18 U.S.C.A. § 3006A(e). Weeks's argument is also supported by the subsequent paragraph, in which the Supreme Court of Virginia exclusively discussed Weeks's application to be heard ex parte on his motion for expert assistance. The fact that the state court did not address a petitioner's federal constitutional claim does not render his claim unreviewable on federal habeas if he demonstrates that the state court had a fair opportunity to address the claim. Cf. Adams v. Robertson, 117 S. Ct. 1028, 1029 (1997) (holding that a federal claim in a state court judgment on which the state court was silent will not be reviewed unless it was properly presented to the state court).

We agree with Weeks and conclude that the Supreme Court of Virginia failed to address his request for expert assistance in the fields of pathology and ballistics on the merits. Thus, we do not apply the standards of review set forth in 28 U.S.C.A. § 2254(d) (West Supp. 1998), which requires that a claim be "adjudicated on the merits in State court proceedings." Because Weeks's request for experts requires us to apply a legal standard to a given set of facts, we review his claim de novo.

C.

Even though Weeks's claim for expert assistance is not subject to 28 U.S.C.A. § 2254(d), we still must determine whether resolving Weeks's claim for experts in his favor would require this Court to announce a new rule in violation of Teague v. Lane, 489 U.S. 288 (1989) (plurality opinion). See Green v. French , 143 F.3d 865, 874 (4th Cir. 1998) (holding that antiretroactivity principles of Teague apply where limitations of § 2254(d)(1) do not). "Under Teague, new rules will not be applied or announced in cases on collateral review unless they fall into one of two exceptions." [7] Penry v. Lynaugh, 492

_____

[7] The two exceptions are new rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making

U.S. 302, 313 (1989). In general, "a case announces a new rule if the result was not <u>dictated</u> by precedent existing at the time the defendant's conviction became final." <u>Teague</u>, 489 U.S. at 301. "The principle announced in <u>Teague</u> serves to insure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered." <u>Sawyer v. Smith</u>, 497 U.S. 227, 234 (1990). Thus, a petitioner cannot receive federal habeas relief "unless reasonable jurists hearing petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor." <u>Graham v. Collins</u>, 506 U.S. 461, 467 (1993) (internal quotation marks omitted).

In determining whether a petitioner seeks a new rule on collateral review, a court should proceed in three steps:

> First, the date on which the defendant's conviction became final is determined. Next, the habeas court considers whether "a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by the existing precedent to conclude that the rule [he] seeks was required by the Constitution." If not, then the rule is new. If the rule is determined to be new, the final step in the <u>Teague</u> analysis requires the court to determine whether the rule nonetheless falls within one of the two narrow exceptions to the <u>Teague</u> doctrine.

<u>O'Dell v. Netherland</u>, 117 S. Ct. 1969, 1973 (1997) (internal citations omitted). Weeks's conviction became final on October 2, 1995, the date the Supreme Court of the United States denied certiorari. We therefore must determine whether as of October 2, 1995, a Virginia state court would have been compelled by existing precedent to conclude that a rule establishing a right to appointment of experts in pathology and ballistics for indigent criminal defendants was required by the Constitution.

_____

authority to proscribe," and "watershed rules of criminal procedure" that significantly improve the accuracy of the factfinding procedure and implicate the fundamental fairness of the trial. <u>See Teague v. Lane</u>, 489 U.S. 288, 311-12 (1989) (plurality opinion).

Supreme Court precedent establishes the principle that the government, upon request, must provide indigent defendants with the "basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." Britt v. North Carolina, 404 U.S. 226, 227 (1971); see Douglas v. California, 372 U.S. 353, 357-58 (1963); Griffin v. Illinois, 351 U.S. 12, 18-19 (1956) (plurality opinion). Although the government need not purchase for the indigent defendant all the assistance that a wealthier defendant might buy, fundamental fairness requires that indigent defendants have "an adequate opportunity to present their claims fairly within the adversary system." Ross v. Moffitt, 417 U.S. 600, 612 (1974).**8** In Ake v. Oklahoma, 470 U.S. 68 (1985), the Supreme Court held that as part of the basic tools of an adequate defense, an indigent defendant has a due process right to the appointment of a psychiatrist to assist him in his defense when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." Id. at 83. Although there was broad language in Ake suggesting application to a variety of circumstances in which an indigent defendant requests expert assistance, its precise holding was limited to the facts at hand. See id. at 83. In fact, the Supreme Court soon thereafter declined to extend Ake's holding to the appointment of a criminal investigator, fingerprint expert, and ballistics expert and declined to address the question of "what if any showing would [entitle] a defendant to [private nonpsychiatric] assistance" as a matter of federal constitutional law. Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985) (emphasis added).

We interpret Ake and Caldwell together to stand for the proposition that due process as of the time Weeks's conviction became final only required that an indigent defendant be appointed psychiatric experts when his sanity is at issue in the trial. Finding in favor of Weeks on his claim therefore would require us to announce a"new rule" of constitutional law in violation of Teague. Weeks cites Husske, 476 S.E.2d 920, as support for his contention that he is not seeking the announce-

_____

**8** Although most of the early Supreme Court decisions in the area of the treatment of indigents in the criminal justice system rested on an equal protection framework, "[d]ue process and equal protection principles converge in the Court's analysis in these cases." Bearden v. Georgia, 461 U.S. 660, 665 (1983).

20

ment of a new rule, but rather the application of an old rule. In Husske, the Supreme Court of Virginia noted the following:

> Our research reveals that most courts which have considered the question whether an indigent defendant is entitled to the appointment of a non-psychiatric expert have applied the rationale in Ake, and, those courts have held that the Due Process and Equal Protection clauses require the appointment of non-psychiatric experts to indigent defendants depending upon whether the defendants made a particularized showing of the need for the assistance of such experts.

Id. at 925 (citing numerous cases from state and federal courts). The Supreme Court of Virginia continued, "We are of the opinion that Ake and Caldwell, when read together, require that the Commonwealth of Virginia, upon request, provide indigent defendants with `the basic tools of an adequate defense,' and, that in certain instances, these basic tools may include the appointment of non-psychiatric experts." Id. (internal citation omitted). The Supreme Court of Virginia then held that an indigent defendant may establish an entitlement to appointment of a non-psychiatric expert "by demonstrating that the services of an expert would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial." Id.

Weeks argues that although the Husske decision came out one year after his conviction became final, it provides a good proxy of what the Supreme Court of Virginia would have concluded had it addressed the issue in Weeks's case, and, therefore, application of the Husske rule to his case would not involve the application of a "new rule." See Lambrix v. Singletary, 117 S. Ct. 1517, 1529 (1997) (holding that case was a "particularly good proxy" for what a reasonable jurist would have thought four years previously, given that the only relevant cases decided in interim were dictated by precedent). We find Weeks's argument to be unpersuasive. The proper inquiry under Teague is whether the Supreme Court of Virginia would have been compelled by existing precedent at the time that Weeks's conviction became final to hold that Weeks was constitutionally entitled to the appointment of experts in pathology and ballistics, not whether the Supreme Court of Virginia would later be convinced after canvassing

21

cases from other courts that such experts may be required in certain instances. Weeks points to no controlling precedent between Ake/Caldwell and Husske that would compel the Supreme Court of Virginia to rule in his favor. Neither the mere fact that prior cases lent general support to the conclusion reached in Husske, nor Weeks's contention that the Supreme Court of Virginia would have felt compelled (by existing precedent at the time that Weeks's conviction became final) to conclude that the rule he seeks was required by the Constitution, suffices to show that Husske was not a new rule. See Sawyer, 497 U.S. at 236.

In fact, we have recently indicated that the Husske rule is not required by Ake and Caldwell. In Gray v. Thompson, 58 F.3d 59 (4th Cir. 1995), this Court considered a habeas petitioner's claim that the Virginia state court's refusal to appoint a private investigator for the defense violated due process. See id. at 66. Citing Caldwell, we noted that the Supreme Court had flatly declined to resolve the question of what, if any, showing would entitle an indigent defendant to private non-psychiatric assistance as a matter of federal constitutional law. See id. We then concluded that resolving that question "would clearly be breaking new constitutional ground." Id. at 66; see also Jackson v. Ylst, 921 F.2d 882, 885-86 (9th Cir. 1990) (declining to address same question). We see no reason why the holding in Gray does not apply to a claim based on a denial of experts in pathology and ballistics. Weeks therefore is requesting this Court to apply the new rule established by Husske to his case.

D.

Because Weeks claims the benefit of a new rule, the rule is not applicable to his case unless it falls within one of two narrow exceptions enunciated in Teague. Weeks argues that even if Husske was a new rule, his request falls under the second exception, which allows retroactive application of a "watershed rule of criminal procedure" that significantly improves the factfinding procedures and implicates the fundamental fairness of the trial. See Teague, 489 U.S. at 311. Weeks contends that in light of Ake and Caldwell it would be fundamentally unfair to conclude that psychiatrists are a basic tool of an adequate defense while non-psychiatric experts are not. In support of his argument, Weeks cites numerous cases in which this Court and

22

others have recognized that due process may entitle an indigent defendant to receive the services of court-appointed independent non-psychiatric experts on request.

We find Weeks's argument to be unpersuasive. Because the second Teague exception is directed toward the accurate determination of guilt or innocence, it is "unlikely that many such components of basic due process have yet to emerge." Teague, 489 U.S. at 313. This Court has recognized that an indigent defendant has a right under the due process clause to the assistance of an expert if a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance. See Williams v. Martin, 618 F.2d 1021, 1027 (4th Cir. 1980). Williams concerned the refusal of the trial court to furnish the defendant with an independent pathologist to serve as an expert witness concerning the cause of the victim's death. See id. at 1026. Because there is no doubt as to the cause of Trooper Cavazos's death, we believe that Weeks's claim does not present the"substantial issue" necessary to invoke the Williams rule. See George v. Angelone, 901 F. Supp. 1070, 1084-85 & n.8 (E.D. Va. 1995) (following Gray and holding that petitioner is not entitled as a matter of due process to private investigator to assist defense in countering Government's "vileness" case at sentencing phase). Moreover, because the Husske rule recognizing a federal constitutional right to non-psychiatric experts in Virginia state cases upon a particularized showing of such need adds to an existing guarantee of due process, it is not an "absolute prerequisite to fundamental fairness" of the type required by Teague's second exception. Sawyer, 497 U.S. at 244.

In sum, we hold that although Weeks's claim for experts in pathology and ballistics was not adjudicated by the state courts, finding a federal constitutional right to such experts upon a particularized showing of need would require us to apply a "new rule" in violation of Teague.**9**

_____

**9** The relevant standard of review under the AEDPA is even more stringent than Teague, because under the AEDPA, a writ will not issue unless a state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d) (West Supp. 1998) (emphasis added). It necessarily follows that if a decision resolving this claim in Weeks's favor is impermissible under Teague, such a decision is also impermissible under § 2254(d).

23

V.

Weeks also argues that the trial court violated his Fifth Amendment right against self-incrimination by refusing to suppress the confession he made to Agent Rowland at the second interrogation. Specifically, Weeks alleges that Agent Rowland's second interrogation failed to "scrupulously honor" Weeks's right to cut off questioning in violation of Michigan v. Mosley, 423 U.S. 96 (1975). Furthermore, Weeks claims that the constitutional error of introducing his statements made at the second interrogation had a "substantial and injurious effect or influence in determining the jury's verdict." (Appellant's Br. at 24-25.)

The relevant circumstances surrounding Weeks's confession are as follows. At 7:40 a.m. on February 24, 1993, Weeks was read his Miranda rights by Agent Rowland, who had become suspicious of him during their conversation. Weeks invoked his right to remain silent and questioning immediately ceased. Upon learning several minutes later that the driver of the car in which Weeks was traveling had identified Weeks as the shooter of Trooper Cavazos, Rowland placed Weeks under arrest. Weeks was then taken before a magistrate and then to the Adult Classification Center in Manassas. Later that morning, in response to routine questions about his physical and mental state from classification officers in the jail, Weeks indicated that he was considering suicide because he had shot the trooper. At approximately 6:00 p.m., Weeks was brought to the lounge of the local prosecutor's office where Rowland again interviewed him. Rowland asked Weeks whether he remembered the rights Rowland had read to him earlier in the day and Weeks answered affirmatively. Rowland proceeded to summarize the evidence against Weeks. At the end of his summary, Rowland told Weeks, "This is your opportunity to provide your explanation as to what happened at the shooting scene." Weeks v. Commonwealth, 450 S.E.2d 379, 385 (Va. 1994). Weeks replied that he was "packing" a firearm and then confessed to Trooper Cavazos's murder.

In Mosley, the Supreme Court addressed an issue left open by Miranda v. Arizona, 384 U.S. 436 (1966) -- the circumstances, if any, under which resumption of questioning is permissible after a person in custody has indicated that he wishes to remain silent. See

24

Mosley, 423 U.S. at 100-02. Rejecting an interpretation of Miranda that would "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent," id. at 102-03, the Supreme Court concluded "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored,'" id. at 104. The Supreme Court set forth the following list of factors for a court to consider in making this inquiry: (1) whether the police had given the suspect Miranda warnings at the first interrogation and the suspect acknowledged that he understood the warnings; (2) whether the police immediately ceased the interrogation when the suspect indicated that he did not want to answer questions; (3) whether the police resumed questioning the suspect only after the passage of a significant period of time; (4) whether the police provided a fresh set of Miranda warnings before the second interrogation; and (5) whether the second interrogation was restricted to a crime that had not been a subject of the earlier interrogation. See id. at 104-07.

Weeks argues that his second interrogation was in violation of Mosley because his interrogators violated three of the Mosley factors: a significant amount of time had not passed between interrogations, no new Miranda warnings were given, and the second interrogation concerned the same crime that was the subject of the first interrogation. Insofar as Weeks suggests that the failure to satisfy certain factors is dispositive of whether a Mosley violation has occurred, we disagree. Mosley does not prescribe a bright-line test to determine whether a suspect's right to cut off questioning was "scrupulously honored." Instead, the touchstone is whether a "review of the circumstances" leading up to the suspect's confession reveals that his "right to cut off questioning was fully respected." Mosley, 423 U.S. at 104; see also United States v. Schwensow, 151 F.3d 650, 659 (7th Cir. 1998); United States v. Alvarado-Saldivar, 62 F.3d 697, 699 (5th Cir. 1995).

Applying the Mosley factors to Weeks's case, we cannot conclude that the Supreme Court of Virginia's decision to uphold the trial court's admission of Weeks's confession was contrary to or an unreasonable application of Mosley. The first factor in the Mosley analysis

25

is whether the suspect was advised before the initial interrogation that he had the right to remain silent. The second factor is whether there was an immediate stoppage of questioning once the suspect asserted his right to remain silent. In this case, it is undisputed that Weeks received full <u>Miranda</u> warnings during his first interrogation by Agent Rowland and that questioning ceased immediately once Weeks invoked his right to cut off questioning.

The third factor in the <u>Mosley</u> analysis is whether the police waited a significant period of time after the suspect's initial invocation of his right to remain silent before questioning the suspect again. A significant period of time between interrogations does not require a durational minimum. <u>Compare United States v. Cody</u>, 114 F.3d 772, 775-76 (8th Cir. 1997) (holding that three hours was significant amount of time) <u>with United States v. Barone</u>, 968 F.2d 1378, 1385 (1st Cir. 1992) (holding that more than twenty-four hours was insufficient where police repeatedly pressured suspect to cooperate). Instead, a "significant period of time" is a function of to what degree the police "persist[ed] in repeated efforts to wear down [the suspect's] resistance and make him change his mind." <u>Mosley</u>, 423 U.S. at 105-06. In this case, over ten hours passed between the time when Weeks invoked his right to cut off questioning and the second interrogation, during which time Weeks was asked routine questions about his physical and mental state but was not subjected to repeated efforts to wear down his resistance. It was reasonable for the Supreme Court of Virginia to conclude that this period of time was sufficient. <u>See Mosley</u>, 423 U.S. at 104-06 (considering two hours to be a "significant period of time").

The fourth factor in the <u>Mosley</u> analysis is whether the suspect received a fresh set of <u>Miranda</u> warnings prior to the second interrogation. In this case, Agent Rowland admittedly did not reinform Weeks of his right to remain silent prior to the second interrogation. Agent Rowland did, however, ask Weeks whether he remembered the rights he had been read from the first interrogation, and Weeks responded that he did. Weeks then proceeded to confess voluntarily to the trooper's murder. The fact that incomplete <u>Miranda</u> warnings, or no warnings at all, are given prior to the second interrogation is not decisive. <u>See</u>, <u>e.g.</u>, <u>United States v. Andrade</u>, 135 F.3d 104, 106-07 (1st Cir. 1998) (finding no <u>Mosley</u> violation where officer asked suspect whether he remembered rights that were read to him earlier and

26

suspect answered in affirmative); Kelly v. Lynaugh, 862 F.2d 1126, 1131 (5th Cir. 1988) (finding that failure to give new Miranda warnings did not establish Mosley violation because in light of two oral warnings and one written warning given earlier, it would be difficult to conclude that suspect had forgotten his Miranda rights); Stumes v. Solem, 752 F.2d 317, 319-22 (8th Cir. 1985) (finding that failure to give new Miranda warnings did not establish Mosley violation because suspect's conduct indicated that he was aware of his Miranda rights). This principle is particularly apt here, as Weeks apparently was aware of his Miranda rights and voluntarily chose not to exercise them. See Andrade, 130 F.3d at 106-07; Stumes, 752 F.2d at 321. The fact that Weeks spoke to an officer to whom he had previously asserted his right to cut off questioning further indicates that he was comfortable in exercising this right and that his decision not to exercise this right was the product of volition rather than of coercion.

The fifth factor in the Mosley analysis is whether the second interrogation concerned a crime that was the subject of the first interrogation. In this case, both interrogations concerned the same crime -- the murder of Trooper Cavazos. Where other factors indicate that a defendant's right to cut off questioning was "scrupulously honored," however, the mere fact that a second interrogation involves the same crime as the first interrogation does not necessarily render a confession derived from the second interrogation unconstitutionally invalid under Mosley. See, e.g., Schwensow, 151 F.3d at 659 ("[T]he constitutionality of a subsequent police interview depends not on its subject matter but rather on whether the police, in conducting the interview, sought to undermine the suspect's resolve to remain silent."); Hatley v. Lockhart, 990 F.2d 1070, 1074 (8th Cir. 1993) ("[A] second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview."); United States v. Hsu, 852 F.2d 407, 410 (9th Cir. 1988) (noting that under flexible Mosley approach, "an identity of subject matter in the first and second interrogations is not sufficient, in and of itself, to render the second interrogation unconstitutional").

In sum, under the totality of the circumstances, it was reasonable for the Supreme Court of Virginia to conclude that the police "scrupulously honored" Weeks's right to cut off questioning. The record before us clearly demonstrates that the Supreme Court of Virginia's

27

decision upholding the trial court's admission of Weeks's confession derived from the second interrogation was neither contrary to Mosley nor an application or interpretation of Mosley "that reasonable jurists would all agree [wa]s unreasonable." Green v. French, 143 F.3d 865, 870 (4th Cir. 1998).**10**

VI.

Next, Weeks argues that the district court erred in holding that several of his claims were procedurally defaulted. Under the well-established doctrine of procedural default, a federal habeas court may not review a claim that a state court has found to be clearly and expressly defaulted under an independent and adequate state procedural rule unless the prisoner can demonstrate cause for the default and prejudice resulting therefrom or demonstrate that a failure to consider the claims will result in a fundamental miscarriage of justice.**11** See Coleman v. Thompson, 501 U.S. 722, 750 (1991); Harris v. Reed, 489 U.S. 255, 262 (1989). A state rule is adequate if it is "firmly established," James v. Kentucky, 466 U.S. 341, 348 (1984), and regularly and consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

_____

**10** Even if we were to apply the pre-AEDPA standard of de novo review, see Howard v. Moore, 131 F.3d 399, 406 (4th Cir. 1997) (en banc), cert. denied, 119 S. Ct. 108 (1998), we would conclude, for the reasons discussed, that Weeks has failed to show that the police did not "scrupulously honor" his right to cut off questioning under Mosley.
**11** Under the "miscarriage of justice" doctrine, a writ may be granted even without a showing of cause if a constitutional violation has probably resulted in the conviction of someone who is actually innocent. See Murray v. Carrier, 477 U.S. 478, 496 (1986). In a capital case, to show "actual innocence" of the death penalty, a petitioner must show by clear and convincing evidence that but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty. See Sawyer v. Whitley, 505 U.S. 333, 348 (1992). Before this Court, Weeks has not argued that our refusal to address his procedurally defaulted claims would result in a "miscarriage of justice." Accordingly, we do not address the "miscarriage of justice" exception.

28

A.

First, Weeks asserts that the district court erred when it determined that Claims IV and XXIV were procedurally defaulted. On direct appeal, the Supreme Court of Virginia ruled that it would not address Weeks's assignment of errors 10 and 36 because Weeks failed to register these objections at trial as required by Rule 5:25 of the Rules of the Supreme Court of Virginia.**12**Weeks v. Commonwealth, 450 S.E.2d 379, 388, 389 (Va. 1994). Weeks subsequently raised these objections in his federal habeas petition as Claims IV and XXIV. The district court found these claims to be procedurally defaulted under Rule 5:25. Weeks v. Angelone, 4 F. Supp.2d 497, 515 (E.D. Va. 1998).

Weeks does not dispute that these claims are procedurally defaulted under Rule 5:25, but he now argues that Rule 5:25 is not an adequate state procedural bar because it is not regularly and consistently applied by the Virginia state courts. As support for this contention, Weeks cites several Virginia state cases that allegedly demonstrate that Virginia courts have often strayed from the contemporaneous objection rule.

We find this argument to be without merit. As a general matter, an unambiguous court rule such as Rule 5:25 is necessarily "firmly established." See O'Dell v. Netherland, 95 F.3d 1214, 1241 (4th Cir. 1996) (en banc). Moreover, contrary to Weeks's assertion on appeal, the Supreme Court of Virginia has regularly and consistently applied Rule 5:25 in recent years. See, e.g., Fairfax Hosp. v. Curtis, 492 S.E.2d 642, 648 (Va. 1997); Angstadt v. Atlantic Mut. Ins. Co., 492 S.E.2d 118, 121 (Va. 1997); Hughes v. Cole, 465 S.E.2d 820, 831 (Va. 1996); see also Bennett v. Angelone, 92 F.3d 1336, 1345 n.7 (4th Cir. 1996) ("Normally, the Virginia Supreme Court will not review errors not preserved by contemporaneous objection."). The mere recitation of a few cases in which the Supreme Court of Virginia has not

_____

**12** Rule 5:25 provides: "Error will not be sustained to any ruling of the trial court or the commission before which the case was initially tried unless the objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Va. Sup. Ct. R. 5:25 (Michie 1998).

applied Rule 5:25 is insufficient to show that Rule 5:25 is not consistently or regularly applied because "[c]onsistent or regular application of a state rule of procedural default does not require that the state court show an undeviating adherence to such rule admitting of <u>no</u> exception, when the state procedural rule has, as a general rule, . . . been applied in the vast majority of cases." <u>Yeatts v. Angelone</u>, 166 F.3d 255, 263-64 (4th Cir. 1999) (internal quotation marks and citations omitted); <u>accord Smith v. Dixon</u>, 14 F.3d 956, 972 (4th Cir. 1994). Weeks therefore fails to establish that Rule 5:25 is not an independent and adequate state procedural bar precluding review of errors he did not raise at trial.

B.

Next, Weeks claims that the district court erred when it determined that Claims II, III, VI, VIII, XVII, XXI, and XXIII were procedurally defaulted. On direct appeal, Weeks filed a ninety-page brief that raised forty-seven errors. He moved for leave to file an oversized brief pursuant to Rule 5:26. The Supreme Court of Virginia denied Weeks's motion and ordered him to file a fifty-page brief.**13** Due to the space limitation, Weeks deleted the arguments supporting ten claims of federal constitutional error. The Supreme Court of Virginia refused to consider these ten claims (nos. 4, 5, 6, 7, 8, 17, 26, 31, 38, and 39) for failure to brief or argue the errors. <u>Weeks</u>, 450 S.E.2d at 383 (citing <u>Jenkins v. Commonwealth</u>, 423 S.E.2d 360, 364 (Va. 1992)). Weeks subsequently raised seven of these claims in his federal habeas petition as Claims II, III, VI, VIII, XVII, XXI, and XXIII. The district court found these claims to be procedurally defaulted for failure to brief them on direct appeal. <u>Weeks</u>, 4 F. Supp.2d at 515-17.

Weeks now argues that the state rule preventing consideration of claims not briefed on direct appeal does not constitute an adequate and independent state bar because the fifty-page limitation physically prevented him from presenting these claims. In the alternative, Weeks argues that even if the rule is an adequate and independent state pro-

_____

**13** Rule 5:26(a) provides: "Except by permission of a justice of this Court, neither the opening brief of appellant, nor the brief of appellee, nor a brief amicus curiae shall exceed 50 typed or 36 printed pages." Va. Sup. Ct. R. 5:26(a) (Michie 1998).

30

cedural bar, he has shown cause and prejudice to overcome the bar because the Supreme Court of Virginia's refusal to deviate from its fifty-page limit even when it was on notice that Weeks needed more than fifty pages to present his arguments was an "objective factor external to the defense" that impeded Weeks's ability to comply with the state procedural rule. Weeks also argues that by proffering the defaulted claims in his original oversized brief, he satisfied the exhaustion requirement for the purposes of federal proceedings and that further presentation of these claims was not required because the fifty-page limitation rendered the state appellate process ineffective to protect his rights. We address these arguments in turn.

1.

First, Weeks argues that the state procedural bar preventing consideration of claims not briefed on direct appeal was not adequate and independent because the fifty-page brief limit physically prevented him from presenting all forty-seven assigned errors to the Supreme Court of Virginia. In support of this argument, Weeks cites Reese v. Peters, 926 F.2d 668 (7th Cir. 1991). In Reese, state law prevented the petitioner from raising several claims in post-conviction proceedings in state court. See id. at 670. On federal habeas review, the district court deemed these claims to be forfeited. See id. The Seventh Circuit stated that "[w]hen state law does not allow the prisoner to present a particular claim, the omission -- submitting to limitations established by law -- is not an independent and adequate state ground precluding federal review." Id. The Seventh Circuit concluded, however, that because the petitioner did not present the claims on direct appeal from his conviction, he forfeited the claims on collateral review. See id. at 671.

Reese cuts against Weeks's argument rather than supporting it. Much like the petitioner in Reese, Weeks voluntarily withdrew the arguments supporting several claims on direct appeal. The fifty-page limit merely limited the manner in which Weeks could present his arguments; it did not wholly prevent him from presenting them. Moreover, the Supreme Court of Virginia has regularly and consistently refused to consider claims not briefed or argued on direct appeal. See, e.g., Mueller v. Commonwealth, 422 S.E.2d 380, 385 (Va. 1992); Quesinberry v. Commonwealth, 402 S.E.2d 218, 222 (Va.

31

1991); <u>Eaton v. Commonwealth</u>, 397 S.E.2d 385, 390 (Va. 1990). The state procedural rule that deems arguments not briefed to be waived is therefore an adequate and independent state bar.

2.

Second, Weeks argues that even if the state procedural bar was adequate and independent, cause and prejudice existed for his default. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Weeks argues that the fifty-page limit imposed by the Supreme Court of Virginia was itself an "objective factor external to the defense" that impeded his effort to comply with the state procedural rule.

We find this argument unpersuasive. While the page limitation may have led Weeks's counsel to make certain strategic choices as to which arguments to include and which to omit, the page limitation is reasonable.**14** It would be nonsensical to hold that the fifty-page limit, which is itself a reasonable and consistently applied state procedural rule, could constitute cause for failure to adhere to another state procedural rule that deems issues not briefed on direct appeal to be waived. The fifty-page limit therefore did not constitute cause for Weeks's failure to comply with the state procedural rule requiring litigants to brief issues on appeal in order to preserve them.

3.

Finally, Weeks argues that by presenting the defaulted claims in his original oversized brief, he satisfied the exhaustion requirement for purposes of federal proceedings. Weeks also argues that further presentation of these claims was not required because circumstances existed that rendered the state appellate process ineffective to protect his rights. <u>See</u> 28 U.S.C.A. § 2254(b)(1)(B)(ii) (West Supp. 1998). It appears that Weeks is conflating the related concepts of exhaustion

_____

**14** The United States Supreme Court limits opening briefs to 50 pages. <u>See</u> U.S. S. Ct. R. 33.1(g).

and procedural default.**15** Both parties, the district court, and we agree that Weeks's claims have been exhausted. The issue, however, is whether these claims are defaulted by Weeks's failure to brief them on direct appeal, and, if so, whether there is cause for and prejudice resulting from Weeks's default. As we concluded above, the state rule preventing consideration of claims not briefed on direct appeal is an adequate and independent state bar, and the fifty-page limit does not constitute cause for defaulted claims not presented on appeal. Weeks therefore fails to show that the state procedural rule barring review of claims not briefed on appeal is not an adequate and independent state bar precluding review of the claims he chose not to present to the Supreme Court of Virginia in his fifty-page brief.

## C.

Finally, Weeks claims that the district court erred when it determined that his ineffective-assistance-of-trial-counsel claims were procedurally defaulted. As of July 1, 1995, prisoners under a sentence of death were required to comply with a statute of limitations for filing a habeas petition and were limited to filing an original petition in the Supreme Court of Virginia. See Va. Code Ann.§ 8.01-654.1 (Michie Supp. 1998); Va. Sup. Ct. R. 5:7A(a) (Michie 1998). **16** (J.A. at 517-

_____

**15** "To satisfy the exhaustion requirement, a habeas petitioner must fairly present his claim to the state's highest court." Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997). "A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally defaulted under state law if the petitioner attempted to raise it at this juncture." George v. Angelone, 100 F.3d 353, 363 (4th Cir. 1996). Thus, the exhaustion requirement is also satisfied when a state procedural rule would bar consideration of the unexhausted claim if the claim was presented to the state court. See Matthews, 105 F.3d at 911 (citing Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)). A claim is procedurally defaulted when it is rejected by a state court on an adequate and independent procedural ground. See Coleman, 501 U.S. at 750.

**16** Section 8.01-654.1 provides:"No petition for a writ of habeas corpus filed by a prisoner held under a sentence of death shall be considered unless it is filed within sixty days after . . . denial by the United States Supreme Court of a petition for a writ of certiorari to the judgment of the

33

20.) Weeks's state habeas counsel erroneously filed Weeks's habeas petition in the Circuit Court for Prince William County. On December 1, 1995, the date on which Weeks's state habeas petition was due in the Supreme Court of Virginia, habeas counsel withdrew the petition and mailed it to the Supreme Court of Virginia by regular mail. The Supreme Court of Virginia received the petition on December 4, 1995.[17] On March 15, 1996, the Supreme Court of Virginia granted the Commonwealth's motion to dismiss Weeks's petition as untimely, and, therefore, jurisdictionally barred. The district court found Weeks's ineffective-assistance-of-trial-counsel claims to be procedurally defaulted due to the untimely filing of his state habeas petition. Weeks, 4 F. Supp.2d at 510-11.

In Virginia, claims of ineffective assistance of trial counsel generally must be presented on collateral review rather than direct appeal. See Roach v. Commonwealth, 468 S.E.2d 98, 105 n.4 (Va. 1996). Weeks does not dispute that the untimely filing of his state habeas petition constitutes an independent and adequate state bar to the consideration of his ineffective-assistance-of-trial-counsel claims on federal habeas, but he now argues that cause and prejudice exist to excuse his defaults. Specifically, Weeks alleges that the defaults resulted from the clear conflict of interest under which his court-appointed state habeas attorney labored: the attorney had previously represented at trial another capital defendant, who was subsequently represented on state habeas by Weeks's former trial attorney. As support for his contention that such a conflict constitutes "cause," Weeks cites Legal Ethics Opinion (LEO) No. 1665, issued on April 1, 1996, by the Virginia State Bar, which condemned such"cross appointments" because each counsel "was expected to zealously advocate

_____

Supreme Court of Virginia on direct appeal." Va. Code. Ann. § 8.01-654.1 (Michie Supp. 1998). Rule 5:7A(a) provides:"A petition for a writ of habeas corpus shall be filed in the office of the clerk of this Court within 60 days after . . . the denial by the Supreme Court of the United States of a petition for a writ of certiorari to the judgment of this Court on direct appeal." Va. Sup. Ct. R. 5:7A(a) (Michie 1998).
[17] Had Weeks's state habeas petition been mailed by registered or certified mail, rather than by ordinary mail, it would have been deemed timely. See Va. Sup. Ct. R. 5:5(b) (Michie 1998).

34

petitioner's claims of ineffective assistance of counsel . . . while simultaneously defending himself against substantially similar claims."

Ineffective assistance of counsel may constitute "cause" for a procedural default under certain circumstances. Murray, 477 U.S. at 488. For an attorney error to constitute cause, however, a petitioner must first possess a constitutional right to assistance of counsel. See Coleman, 501 U.S. at 752. This Court has recently held that a petitioner has no constitutional right to assistance of counsel in state habeas proceedings, even though claims of ineffective assistance of trial counsel can only be raised on state collateral review. See Mackall v. Angelone, 131 F.3d 442, 449 (4th Cir. 1997) (en banc), cert. denied, 118 S. Ct. 907 (1998). In an attempt to avoid the binding precedent of Mackall, Weeks argues that he possesses a liberty interest in conflict-free habeas representation that is protected under the due process clause of the Fourteenth Amendment based on his statutory right to counsel under Va. Code Ann. § 19.2-163.7 (Michie 1995).**18** Weeks further contends that the actions of his conflicted state habeas counsel in failing to observe the jurisdictional rules in filing his state habeas petition and in failing to withdraw after the Virginia State Bar issued LEO No. 1665, and of the state courts in appointing conflicted counsel, constituted violations of his due process rights.

Although Weeks characterizes the conduct of his state habeas counsel as "outrageous," at the district court level he relied on the same set of facts in making his Sixth Amendment claim of ineffective assistance of habeas counsel as his Fourteenth Amendment due process claim. We thus view his argument as an attempt to shoehorn a claim of ineffective assistance of counsel into a due process claim. We agree with the Ninth Circuit's reasoning in Bonin v. Calderon, 77 F.3d 1155 (9th Cir. 1996), which denied a due process claim nearly identical to Weeks's:

_____

**18** Section 19.2-163.7 of the Virginia Code provides that following the affirmance of a death sentence on appeal to the Supreme Court of Virginia, the circuit court shall appoint counsel to represent an indigent prisoner in a state habeas proceeding. See Va. Code Ann. § 19.2-163.7 (Michie 1995).

35

> [The petitioner] essentially argues that the Fourteenth Amendment violation <u>is</u> his ineffective assistance of counsel. . . . [W]e now hold that ineffective assistance of counsel in habeas corpus proceedings does not present an independent violation of the Sixth Amendment enforceable against the states through the Due Process Clause of the Fourteenth Amendment. To recognize such a claim would allow the Fourteenth Amendment to "swallow the rule" that there is no constitutional right to effective assistance of counsel in habeas corpus proceedings.

<u>Id.</u> at 1160; <u>see also Smith v. Angelone</u>, 111 F.3d 1126, 1133 n.4 (4th Cir. 1997) ("We have never held that a prisoner may claim a due process violation based upon his lawyer's performance on state habeas . . . ."), <u>cert. denied</u>, 118 S. Ct. 2 (1997). Under the persuasive reasoning of <u>Bonin</u>, a petitioner may claim a due process violation occurring in his state habeas proceeding, but he may not premise this claim solely on the alleged ineffective assistance of state habeas counsel. Because Weeks's due process claim is the same as his claim of ineffective assistance of habeas counsel and this Court does not recognize a constitutional right to counsel on state habeas, the alleged ineffective assistance of habeas counsel cannot constitute cause to excuse Weeks's defaulted ineffective-assistance-of-trial-counsel claims.

VII.

In conclusion, for the reasons discussed above, we hold that Weeks has failed to make "a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(2) (West Supp. 1998). We therefore deny his application for a certificate of appealability and dismiss his petition.

<u>DISMISSED</u>

36