# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-1951

KEVIN A. CONNER,

*Petitioner-Appellant,*

v.

DANIEL MCBRIDE, Superintendent,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 99 C 1923—**Sarah Evans Barker**, *Judge.*

ARGUED JANUARY 16, 2004—DECIDED JULY 20, 2004

Before EASTERBROOK, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* This habeas corpus appeal comes to us following Kevin Conner's October 7, 1988 conviction for three murders in Indiana. The jury recommended death for the killings and, subsequently, the state court judge sentenced Conner to two death sentences and a term of 60 years on November 3, 1988. After exhausting his state remedies, *see Conner v. State*, 580 N.E.2d 214, 217 (Ind. 1991), *cert. denied*, 503 U.S. 946 (1992) ("*Conner I*"); *Conner v. State*, 711 N.E.2d 1238 (Ind. 1999), *cert. denied*, 531 U.S. 829 (2000) ("*Conner II*"), Conner then filed a petition for

federal habeas corpus relief, which the district court denied, *Conner v. Anderson*, 259 F. Supp. 2d 741, 769 (S.D. Ind. 2003) ("*Conner III*").

## I. Background

The facts surrounding Conner's crimes, which occurred on the south side of Indianapolis, are essentially undisputed. Sometime during the early morning of January 26, 1988, Conner, Tony Moore, Bruce Voge, and Steve Wentland were drinking at Moore's house. When Conner, Moore, and Wentland went for a drive in Wentland's car, Voge stayed behind at the house. During the drive, an argument broke out between Moore, who was seated in the front, and Wentland, who was driving. As a result, Moore stabbed Wentland with Conner's knife, which caused Wentland to abandon the car and run. Conner, armed with the knife, pursued Wentland on foot, while Moore took control of the car and ran Wentland down. After Wentland was down, Conner beat him with his fists and stabbed him multiple times with the knife, eventually killing him.

Conner and Moore then drove to Conner's place of employment, where they awoke Conner's employer and were given access to a warehouse. Another argument ensued between Conner and Moore about what had just happened and what they should do. During the argument, Conner obtained his sawed-off shotgun, shot, and killed Moore. This reawakened Conner's employer, who confronted Conner as he exited the warehouse building. Conner replied that "he had to off Tony." Conner next left the warehouse and drove to Moore's house, where he shot and killed Voge, while Voge lay on the couch.

Conner then went about disposing of Moore's body with the aid of various friends, abandoned Wentland's automobile, and fled the area. He was apprehended in Texas on

January 30, 1988 and returned to Indiana to face murder charges in the Marion County Superior Court in Indianapolis.

The trial lasted from October 3 to 7, 1988, and the jury found Conner guilty of each killing. The penalty phase hearing was held on October 9, and the jury recommended death, as sought by the state. Then on November 3, the state court sentenced Conner to death for the murders of Voge and Moore, and to a term of 60 years for the murder of Wentland.

On direct appeal in state court, Conner claimed fifteen errors had occurred in connection with his trial and sentencing, including that his confession was improperly admitted because it was obtained in violation of his Fifth Amendment rights, as outlined in *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. *Conner I*, 580 N.E.2d at 216, 219. The Supreme Court of Indiana ultimately affirmed the lower courts' rejection of all these arguments. *Id.* at 221.

Conner next sought post-conviction relief, which under Indiana law is a remedy limited to issues not known at trial or not available on direct appeal. *See Conner II*, 711 N.E.2d at 1244. He again asserted numerous errors, including: (1) his confession was obtained through manipulation, without regard to his mental disorders, and was therefore improperly admitted at trial;[1] (2) an improper ex parte communication between the jury and a bailiff took place during penalty-phase deliberations; and (3) he was denied effective assistance of trial counsel. *Id.* at 1244-45, 1247-48. After hearing testimony and receiving other evidence as to many of the issues raised, the original post-conviction court denied Conner's petition for relief. On appeal, because the

---

[1]  As to why the post-conviction court considered the admissibility of Conner's confession for a second time, see *infra* note 3.

Indiana Supreme Court did not find that the evidence unmistakably and unerringly led to a conclusion contrary to that reached by the post-conviction court below, it affirmed the denial of Conner's petition with respect to all issues. *See id.* at 1259.

Finding no relief in the state courts, Conner filed a petition for habeas corpus relief in federal district court. *Conner III*, 259 F. Supp. 2d at 752. Among other myriad issues, Conner again raised the propriety of the admission of his confession at trial, the alleged ex parte communication between a bailiff and the jury, and the ineffective assistance of trial counsel. *Id.* After an exhaustive analysis of each of the issues raised by Conner, the district court denied relief. *Id.* at 769. He now appeals this denial, but only with respect to the three issues listed above. And for the reasons that follow, we affirm.

## II.  Analysis

### A.  Legal Standards

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a) (1996). In this case, the particular contours of our habeas review are restricted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997).

However, to even raise any claim of error in habeas, state remedies must be exhausted. *Mahaffey v. Schomig*, 294 F.3d 907, 914 (7th Cir. 2002). In other words, each claim of error must be raised first in state court, *Breard v. Greene*, 523 U.S. 371 (1998), so that the state courts have an opportunity to correct constitutional violations, *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981). If a petitioner fails to exhaust, and the court to which he would have been

permitted to present his claims would now find such claims procedurally barred, then those claims are procedurally defaulted for habeas purposes. *Coleman v. Thompson*, 501 U.S. 722, 729 n.1 (1991). Likewise, procedural default also occurs if the state court decision rests on a state procedural rule that is independent of the federal question and adequate to support the judgment. *Id.* at 729; *see also Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (explaining when such a rule is "adequate"). However, in either situation, all may not be lost—a federal court may still hear a petitioner's claim if he can demonstrate either (a) cause for the default and prejudice (i.e., the errors worked to the petitioner's "*actual* and substantial disadvantage," *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)); or (b) that failure to consider his claim would result in a fundamental miscarriage of justice (i.e., a claim of actual innocence, *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). *See McCleskey v. Zant*, 499 U.S. 467, 493-95 (1991); *Coleman*, 501 U.S. at 750. Here, neither exhaustion nor procedural default are materially at issue with respect to Conner's three claims, with one minor exception discussed later.

Turning to the substantive restrictions AEDPA places upon habeas review, when a claim has been adjudicated by the state courts on the merits, that is, substantively and not procedurally, *see*, *e.g.*, *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997), a writ should be granted only if the state court's decision was "contrary to" clearly established federal law as determined by the Supreme Court, § 2254(d)(1), involved an "unreasonable" application of the same, *id.*, or was based upon an "unreasonable" determination of the facts in light of the evidence presented in the state court proceedings, § 2254(d)(2).

These restrictions have been further explained by numerous cases, a handful of which are noted herein. First, a state court decision is "contrary to" federal law if the state court either incorrectly laid out governing Supreme Court

precedent, or, having identified the correct rule of law, decided a case differently than a materially factually indistinguishable Supreme Court case. *Williams v. Taylor*, 529 U.S. 362, 405-06, 412-13 (2000); *see also Hammer v. Karlen*, 342 F.3d 807, 810 (7th Cir. 2003).

Next, a state court's application of a correct statement of federal law is "unreasonable" if it is objectively so, and not merely erroneous or incorrect. *Williams*, 529 U.S.at 410-12; *A.M. v. Butler*, 360 F.3d 787, 794-95 (7th Cir. 2004) (citing *Wiggins v. Smith*, 539 U.S. ___, 123 S. Ct. 2527, 2535 (2003)). Specifically, a state court's decision "minimally consistent with the facts and circumstances of the case" is not unreasonable, *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997), while a determination "lying well outside the boundaries of permissible differences of opinion" is, *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002), *cited in Ward v. Sternes*, 334 F.3d 696, 703 (7th Cir. 2003).

Last, factual determinations of a state court are presumed to be correct and hence not "unreasonable," unless a petitioner can show otherwise by clear and convincing evidence. *See Ward*, 334 F.3d at 704 (citing 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 339-42 (2003)); *see also Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999) (calling this a "rigorous burden of proof").

Whether a state ruling runs afoul of these AEDPA standards is a legal determination, and, as such, we review the conclusions of the district court de novo. *Ward*, 334 F.3d at 704; *see Sweeney v. Carter*, 361 F.3d 327, 330 (7th Cir. 2004) (citing *Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999)). Consequently, our analysis focuses primarily upon the decisions and factual findings of the Marion County Superior

Court,[2] the court which heard Conner's original petition for post-conviction relief ("post-conviction court" or "PCR court").[3]

---

[2] The Marion County Superior Court was the situs of both Conner's trial and his initial post-conviction review proceedings.

[3] The determinations of the PCR court clearly should be the focus of our AEDPA analysis with respect to the two claims which were raised for the first time in Conner's petition for post-conviction relief, namely, that there was an improper ex parte communication between a bailiff and the jury and that he suffered ineffective assistance of trial counsel. *But see also infra* notes 7, 10, and 11 (explaining that we also looked to the Indiana Supreme Court's holdings as to three subsidiary ineffective assistance of counsel issues where the PCR court did not make any express findings). However, Conner challenged the admissibility of his confession both on direct appeal *and* in his post-conviction petition for relief. Thus, it would seem that we would need to analyze the decisions of both the trial court, which heard and denied Conner's original motion to suppress, and the PCR court's denial of relief with respect to his confession. But this is not so.

As the Indiana Supreme Court noted in its review of the post-conviction court's denial of relief, the PCR court could have refused to consider the admissibility of Conner's confession on res judicata grounds, since on direct appeal the Indiana Supreme Court, *see Conner I*, 580 N.E.2d at 219, already determined that the trial court committed no error when it admitted Conner's confession. *Conner II*, 711 N.E.2d at 1247 (citing *Minnick v. State*, 698 N.E.2d 745, 760 (Ind. 1998)). Instead, the PCR court considered the issue fully on its merits, apparently unrestricted by any confining standards of review, took into account all old and new evidence, as presented by both the state and Conner, and ultimately rejected this claim. *See id.* Therefore, we focus our AEDPA analysis with respect to the admissibility of Conner's confession solely upon the factual findings and conclusions of the post-conviction court.

**B.  Application**

**1.  Confession**

After his arrest, Conner signed written waivers of his *Miranda* rights and a written confession, and agreed to be videotaped while giving an incriminating statement to Indianapolis police detectives Green and Stamm. At no time has he challenged the voluntariness of his *Miranda* waivers.[4] But at trial, on direct appeal, throughout his state post-conviction proceedings, and now in his petition for habeas relief, Conner has posited that his confession was involuntary. All state courts considering this issue have disagreed with Conner, and he provides us here with no reason to conclude that the judgment of the Indiana post-conviction court was unreasonable.

Before turning to our substantive analysis, we must dispense with Conner's misguided notion that we should review the PCR court's ruling de novo, unrestricted by AEDPA standards. This is so, he asserts, because neither the trial court nor the PCR court expressly laid out the federal law applicable to the admissibility (i.e., voluntariness) of confessions, as established by *Miranda* and its progeny. However, so long as a habeas petition is filed after AEDPA's effective date and a state court arguably addressed the claim, as is the case here, federal review is inescapably circumscribed by the Act. The question in this case is not whether AEDPA applies, as it most certainly does, but instead whether the post-conviction court's find-

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966), declared that an individual has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). A defendant may waive his entitlement to the rights articulated in *Miranda* "provided the waiver is made voluntarily, knowingly, and intelligently." 384 U.S. at 444.

ings with respect to Conner's confession can pass "AEDPA muster," because none include a statement of, or explicitly apply, federal law.

Although we can imagine a scenario in which a state court's unexplained ruling would present such a maze of uncertainty as to what law was applied and/or what factual findings were made that any challenge to the ruling would be hopelessly confounded, such is not the case here. As we explain below, the post-conviction court's analysis and ultimate decisions comported with federal jurisprudence. *Cf. Edmunds v. Deppisch*, 313 F.3d 997, 999-1000 (7th Cir. 2002) (holding that a state trial court's evidentiary ruling excluding demeanor evidence was a reasonable—although possibly incorrect—application of federal law and thus constitutional where the state court based its ruling solely upon state evidence law, repeatedly refused to address the constitutional issue expressly, and nowhere referred to or applied federal law, because the trial court's reasoning mirrored the balancing test laid out in Fed. R. Evid. 403).

Perhaps guided by the district court's application of AEDPA to his confession claim, *see Conner III*, 259 F. Supp. 2d at 759, Conner does mention the applicable AEDPA standards in the last sentence of the relevant section of his brief to this court. However, he states only that "the state court rulings were clearly unreasonable determinations . . . and/or contrary to" applicable federal law. Conner nowhere explicitly challenges any of the factual findings of the PCR court. At the end of his argument, Conner simply refers us to his statement of facts contained in his brief for information concerning Conner's confession. Arguably, we could consider his confession claim waived in the absence of fully developed legal arguments. Nevertheless, this is a review of a death sentence and, in this instance, prudence directs us to address every argument raised explicitly or implicitly by Conner.

In evaluating the voluntariness of a waiver or confession, a court must consider the totality of the circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Specifically, a confession is "involuntary" only if circumstances demonstrate that police coercion or overreaching overbore the accused's will and caused the confession. *See Dickerson v. United States*, 530 U.S. 428, 434 (2000) (discussing cases). Moreover, such coercion or overreaching is a necessary predicate to a finding of involuntariness. *United States v. Abdulla*, 294 F.3d 830, 836 (7th Cir. 2002). Put differently, a "'confession is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *Id.* (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). In applying the totality test, we have identified a variety of factors which a court may consider to assess voluntariness, including but not limited to: whether the defendant was read his *Miranda* rights; the individualized characteristics of the defendant (i.e., age, intelligence level, education, mental state); interrogation conditions (i.e., duration, environment, access to restroom facilities and food); and the conduct of law enforcement officers (i.e., use of physical punishment). *United States v. Ceballos*, 302 F.3d 679, 694 (7th Cir. 2002); *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997). *See generally Schneckloth*, 412 U.S. at 226, *quoted in Dickerson*, 530 U.S. at 434.

The post-conviction court made numerous factual findings with respect to Conner's confession, which required the court to weigh and evaluate the extensive evidence presented by both the state and Conner. Ultimately, the court concluded that the confession was properly admitted. The court thus applied the totality test, which *Schneckloth*, *supra*, established as the appropriate constitutional test for

voluntariness. Therefore, even if the PCR court's ruling was incorrect, so long as it was reasonable (i.e., within the boundaries of permissible differences of legal opinion), there is no basis for deeming it unconstitutional. *Cf. Edmunds*, 313 F.3d at 999.

Conner challenges the constitutionality of his confession based upon the following assertions: (a) he requested an attorney numerous times; (b) Green and Stamm used a criminal codebook to dupe Conner into thinking that he was only guilty of manslaughter; (c) Green and Stamm "tricked and cajoled" Conner into signing an incriminating statement and agreeing to have his confession videotaped; and (d) Conner's confession omitted key information and conflicted in material respects with incontrovertible facts about the killings.

### a. Conner's request for an attorney and the use of a criminal codebook during Conner's interrogation

Credibility determinations by the PCR court doom Conner's first two assertions. Specifically, the court determined that Conner never requested an attorney and that Detective Green used a law book to discuss legal concepts with Conner, not to mislead him. These determinations are presumed correct unless overcome by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). No such evidence has been shown. Detectives Green and Stamm testified that Conner never requested an attorney. Green testified that he used the criminal codebook to discuss legal concepts with Conner. And the only evidence Conner offered to support his version of the disputed events was his own testimony. Clearly, the PCR court credited the detectives' testimony and disbelieved Conner's self-serving account. Absent more, Conner's assertions are not enough to disturb the PCR court's findings.

### b.  "Trickery" by Detectives Green and Stamm

We next address Conner's assertion that the police offi-cers "tricked and cajoled" him into confessing and agreeing to videotape an incriminating statement. This contention amounts to a claim that the post-conviction court unreason-ably determined that Conner's confession was voluntary. Because the test for voluntariness is a totality of the circumstances test, *see supra*, we consequently must determine whether the PCR court's weighing of the evi-dence was so incredible as to be "well outside the bound-aries of permissible differences of opinion." *See Hardaway*, 302 F.3d at 762. In this case, we can easily say that the PCR court was not unreasonable when it determined that the totality of the circumstances mediated in favor of the conclusion that Conner's confession was voluntary.

First, Conner had been apprised of his constitutional rights (i.e., read his *Miranda* rights) while incarcerated in Texas and again after his arrival in Indiana. He then voluntarily signed multiple waivers of his rights prior to being questioned and before he gave his videotaped state-ment. Conner stated during questioning that he understood his rights and confirmed his awareness of his situation and his option to decline to answer questions or make a state-ment until he had spoken with an attorney.

Second, at the time of his confession, Conner was an adult, twenty-two years of age. Third, the interrogation lasted approximately three hours, at most. Fourth, during the interrogation Conner was provided with food and drink, allowed to use the restroom, given a pack of Camel ciga-rettes upon request, and when it was discovered that the heat was malfunctioning in the interrogation room, he was moved to a different room. Fifth, nowhere does Conner aver that he was physically harmed during the interrogation.

Last, because involuntary confessions are "to an unas-certained extent" untrustworthy, *Rogers v. Richmond*, 365 U.S. 534, 541 (1961); *see also Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("Confessions wrung out of

their makers may be less reliable than voluntary confessions . . . ."), we consider the reliability of Conner's confession as a factor in the totality test. And we cannot say the post-conviction court was unreasonable when it found that Conner's confession was reliable. Conner bases his unreliability argument on the fact that portions of his confession were incompatible with certain incontrovertible facts ascertained at trial. However, the PCR court implicitly determined that despite discrepancies between the details in Conner's confession and particular facts adduced at trial, the principal facts provided in Conner's confession were corroborated. In addition, the court credited the testimony of Detectives Green and Stamm, wherein they both expressed their belief that Conner had been truthful when he confessed. The evidence in the record supports these findings, and Conner has not pointed us to any other evidence which clearly and convincingly shows that the PCR court unreasonably determined that Conner's confession was reliable.

To summarize, the foregoing facts do not support a finding that Conner's confession was anything but voluntary.

Furthermore, we have repeatedly held that "a law-enforcement agent may 'actively mislead' a defendant in order to obtain a confession, so long as a rational decision remains possible." *Ceballos*, 302 F.3d at 695 (quoting *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990)); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) (false statement that a witness had seen the defendant's vehicle in the alley in which the victim had been raped was not coercive without more); *see also United States v. Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001) (false statement that witness had seen her with a gun was not coercive); *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (lie regarding fingerprint evidence was not coercive). Conner cannot point this court to any specific facts which demonstrate how he was "tricked" or "cajoled" by Detectives Green and Stamm. However, he obtusely argues that his alleged mental defect

(an "organic" personality/thought disorder discussed in detail later in this opinion) made him especially susceptible to confusion and trickery and that the detectives' "misuse" of the criminal codebook, discussed *supra*, rendered his confession involuntary.

First, although we explicitly rejected this assertion above, for argument's sake we will assume that the detectives did in fact use a criminal codebook to affirmatively misrepresent Indiana criminal law to Conner. But such a basis is insufficient to deem a state court's admission of a confession unreasonable under AEDPA when a defendant has already voluntarily waived his *Miranda* rights. In *Jackson v. Frank*, 348 F.3d 658, 663-65 (7th Cir. 2003), we considered whether a state court unreasonably applied federal law when it admitted a defendant's confession despite a police officer's misstatement of state law, which preceded the defendant's *Miranda* waiver and concerned the availability of a public defender. We pointed out that the United States Supreme Court has not clarified whether a legal misstatement by a police officer would *per se* make a subsequent *Miranda* waiver involuntary, and that at least one other court of appeals has held that, in and of itself, such a misstatement does not. *Id.* (citing *Duckworth v. Eagan*, 492 U.S. 195, 203-04 (1989); *Colorado v. Spring*, 479 U.S. 564, 576 n.8 (1987); *Soffar v. Cockrell*, 300 F.3d 588 (5th Cir. 2002) (en banc)). Consequently, we held that the state court's decision to allow the confession was not unreasonable. *Id.* at 665. And because in *Jackson* we could not deem "unreasonable" the state court's determination that an officer's misrepresentation of the law *prior* to a *Miranda* waiver did not vitiate the voluntariness of the waiver, then we cannot hold in this case that the PCR court was "unreasonable" in determining that Conner's confession was voluntary, solely because police officers may have misrepresented state criminal law *after* Conner's indisputably voluntary *Miranda* waiver.

Second, the post-conviction court considered conflicting evidence as to whether Conner suffered from a mental disorder or defect at the time of his interrogation. The court's implicit decision to credit the evidence which tended to show that Conner did not suffer from *any* disorder or defect is entitled to our deference, absent clear and convincing evidence to the contrary. *See, e.g., Marshall v. Lonberger*, 459 U.S. 422, 432-33 (1983). Conner has not made such a showing. Even if we credit Conner's evidence of his mental disorder at the time of his interrogation, in order to find that the PCR court's determination was unreasonable, we would also have to find that the defect was of such magnitude as to render Conner so susceptible to trickery, deception, or other standard interrogation tactics (i.e., Conner asserts that Green and Stamm encouraged him to confess because it "is good for the soul") that his free will was overborne. The evidence here in no way supports such a finding.

In conclusion, Conner has failed to present this court with factors pertinent to the interrogation which would suggest that the post-conviction court was well outside the realm of permissible legal conclusions when it held there was no coercive police activity which caused Conner's will to be overborne. Hence, the PCR court was reasonable in finding that Conner's confession was voluntary and that the trial court's admission of his statements to police and the videotaped statement was not error. There is no basis under AEDPA to support Conner's habeas petition as to his confession and the district court's denial of relief was proper.

## 2.  Ex Parte Jury Communication

Conner next contends that his right to be present during all stages of the prosecution against him was violated

when a jury question regarding the law was allegedly answered by a bailiff during deliberations. The constitutional right to "presence" derives from the Sixth Amendment's Confrontation Clause, and the Due Process Clause of the Fifth and Fourteenth Amendments. *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004); *see Ellsworth v. Levenhagen*, 248 F.3d 634, 640 (7th Cir. 2001) (citing *Illinois v. Allen*, 397 U.S. 337, 380 (1970); *United States v. Gagnon*, 470 U.S. 522, 526 (1985)). This right is implicated when there is a reasonably substantial relation to the fullness of opportunity to defend against the charge and to the extent that a fair and just hearing would be thwarted by the defendant's absence. 248 F.3d at 640 (citing *Verdin v. O'Leary*, 972 F.2d 1467, 1482 (7th Cir. 1992) (citing *Gagnon*, 470 U.S. at 526 (1985)). Specifically, *Snyder v. Massachusetts*, 291 U.S. 97, 105-08 (1934), *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), and *Gagnon*, 470 U.S. at 526, make clear that the defendant must be present at "all important steps of the criminal proceeding." *Small v. Endicott*, 998 F.2d 411, 415 (7th Cir. 1993) (pointing out that not every stage of a criminal proceeding is important and holding that a "defendant need not be present at a pretrial hearing where only preliminary matters of a procedural nature are at stake."). In Indiana, generally, with respect to questions posed by a deliberating jury: "the proper procedure is for the judge to notify the parties so they may be present in court and informed of the court's proposed response to the jury before the judge ever communicates with the jury." *Rogers v. R. J. Reynolds Tobacco Co.*, 745 N.E.2d 793, 795 (Ind. 2001) (citing cases). *Cf.* Ind. Jury R. 28 (2003). In the criminal context, if an improper communication occurs between a bailiff and the jury, there is a "presumption of harm to the defendant that the state must rebut to avoid reversal." *Baxter v. State*, 727 N.E.2d 429, 434 (Ind. 2000) (quoting *Alexander v. State*, 449 N.E.2d 1068, 1074 (Ind. 1983)); *see also Winters v. Miller*, 274 F.3d 1161, 1168 (7th Cir. 2001). Reversal may be

avoided only if no harm or prejudice to the defendant resulted. *Baxter*, 727 N.E.2d at 434. This is consistent with the rule that an improper communication with a jury (whether by a judge or court staff) may not be per se unconstitutional if, upon inquiry into the fundamental fairness of the trial as a whole, the improper communication was found to be harmless. *Winters*, 274 F.3d at 1168; *see also Ellsworth*, 248 F.3d at 640-41; *Verdin*, 972 F.2d at 1482; *United States ex rel. Tobe v. Bensinger*, 492 F.2d 232, 238-39 (7th Cir. 1974), *cited in Cramer v. Fahner*, 683 F.2d 1376-87 (7th Cir. 1982). *Cf. United States v. Degraffenried*, 339 F.3d 576, 579-80 (7th Cir. 2003) (citing Fed. R. Crim. Pro. 43; *Rogers v. United States*, 422 U.S. 35 (1975) (laying out procedures for responding to jury questions in federal criminal trials)).

Conner argues that because one or more jurors asked a question regarding sentencing authority during penalty-phase deliberations, because a bailiff provided an answer, and because defense counsel was not present during this communication, Conner was irreparably prejudiced. And thus, he posits, his petition for habeas relief should be granted.

One preliminary issue deserves our attention. Just as Conner erroneously argued that we should consider his confession claim de novo, he also mistakenly thinks that we should review the facts underlying his ex parte jury communication claim de novo. He cites *Weeks v. Angelone*, 176 F.3d 249, 263 (4th Cir. 1999), *aff'd on other grounds*, 528 U.S. 225 (2000), for the proposition that "when a petitioner has properly presented a claim to the state court but the state court has not adjudicated the merits, . . . our review of questions of law and mixed law and fact is *de novo*." Ignoring that *Weeks* is not binding upon this court, Conner also overlooks the fact that *Weeks* addressed a state court's failure to address a claim on its merits when the state court should have done so. This is easily distinguishable from the

instant case. Here, the post-conviction court made a finding of pure fact, which obviated the need to rule upon the substantive merits of Conner's ex parte jury communication claim. Thus, AEDPA circumscribes our review of the PCR court's factual determination that no ex parte jury communication occurred during deliberations. Absent a contrary showing by clear and convincing evidence, this finding is entitled to our deference, *see* 28 U.S.C. § 2254(e)(1), and we need not reach the merits of Conner's ex parte jury communication claim.[5]

The post-conviction court heard and evaluated testimony from six jurors and two bailiffs regarding the alleged communication. All the jurors who testified acknowledged that there was some sort of communication which occurred between at least one juror and a bailiff, but none could testify definitively as to whether it occurred during deliberations. Although some jurors indicated that the communication concerned sentencing authority, most could not recall any other salient details (i.e., which juror asked the question, which bailiff responded, what the exact content of the communication was). Juror Carter had the most factually specific memory of the incident and testified that the bailiff who responded to the question was white, female, middle-aged, and heavyset. However, Carter provided conflicting testimony regarding the timing of the communication, and when pressed, indicated that she was "pretty sure" it occurred after all deliberations had concluded.

The two bailiffs' testimony was substantially similar to the others'. Both indicated that in 1988, it was policy for the

---

[5] We do note that if we found the PCR court's factual determination unreasonable, then we would be free to analyze the substantive merits of this issue de novo (i.e., under pre-AEDPA standards), as there would be no state court analysis to apply AEDPA standards to.

jury to submit any questions it had in writing to the judge, and for the judge to then address the question. Bailiff Hurley, a male who was not specifically assigned to the Conner trial, could not recall any details about the trial. Bailiff De Moss, the only female bailiff who fit the physical description given by juror Carter and who was assigned to the Conner trial, testified that she did not remember receiving or personally addressing any questions from the jury. After hearing from all eight witnesses and considering argument from both Conner and the state, the PCR court held that no improper communication between the jury and court personnel occurred during deliberations.

At most, the foregoing evidence demonstrates factual ambiguity and disagreement regarding the timing of the alleged communication. Put differently, it certainly does not amount to clear and convincing proof that any such communication occurred *during* penalty-phase deliberations in violation of Conner's constitutional right to presence, and Conner has thus failed to meet his burden under AEDPA. Because it cannot be said that the post-conviction court's factual finding was unreasonable, we need not address the substantive merits of Conner's claim. The district court's denial of habeas relief with respect to the petitioner's ex parte jury communication claim was correct.

### 3. Ineffective Assistance of Trial Counsel

Finally, Conner argues that his Sixth Amendment right to counsel was violated because his trial lawyers were ineffective. The well-known legal principles which govern such claims were established in *Strickland v. Washington*, 466 U.S. 668 (1984). For an ineffective assistance of counsel claim to succeed, a petitioner must show that (1) counsel's performance was deficient; and (2) the deficiency prejudiced his defense. More specifically, in order to be considered deficient, representation must fall below "an objective standard of reasonableness." *Id.* at 688. The Supreme Court

has recently "declined to articulate specific guidelines for appropriate attorney conduct and instead [ ] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins*, 539 U.S. at ___, 123 S. Ct. at 2535 (quoting *Strickland*, 466 U.S. at 688). In addition, the performance of counsel under *Strickland* should be evaluated from counsel's perspective at that time, making every effort to "eliminate the distorting effects of hindsight." *Id.* at 2536 (quoting 466 U.S. at 688); *see also Kokoraleis v. Gilmore*, 131 F.3d 692, 696 (7th Cir. 1997). With respect to the prejudice requirement, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, *quoted in Benefiel v. Davis*, 357 F.3d 655, 661 (7th Cir. 2004).

As with each of the first two issues addressed, because this is a habeas petition, we do not apply the *Strickland* standards directly, but instead ask whether the post-conviction court's factual findings and conclusions pass AEDPA muster. Since the PCR court correctly laid out the *Strickland* test, and since Conner does not point this court to any United States Supreme Court case which is factually indistinguishable from his own, he cannot argue that the PCR court's determinations were "contrary to" any clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Furthermore, although Conner does mention (once) the "reasonableness" standard under § 2254(d)(1), he nowhere meaningfully challenges the factual findings of the PCR court. Instead, he simply reiterates and emphasizes the facts which are most helpful to his claim, and then advocates for a legal conclusion other than that reached by the PCR court. Conner has not shown by clear and convincing

evidence that the PCR court's factual determinations were unreasonable. *See* 28 U.S.C. § 2254(e)(1).

Thus, the only question which we need address is whether the post-conviction court's application of *Strickland* was "unreasonable," 28 U.S.C. § 2254(d)(1). Under this highly deferential AEDPA standard, to make a finding of unreasonableness, we must conclude that the PCR court's determinations were "outside the boundaries of permissible differences of opinion," *see Hardaway*, 302 F.3d at 762, and/or defy characterization as merely "*minimally* consistent with the facts and circumstances of the case," *Hennon*, 109 F.3d at 335 (emphasis added).

Before turning to the merits of Conner's argument, we briefly summarize what the record reveals about defense counsels' preparation and strategy with respect to the guilt and penalty phases of Conner's trial, and the evidence which Conner introduced at the post-conviction hearing to support his ineffective assistance claim.

### a. Summary of counsels' preparation and strategy

Conner was represented by two court-appointed attorneys during the guilt and penalty phases, Ricardo Mendez and Steven Lazinsky. At the time of his trial in 1988, Mendez had over ten years of criminal experience, including the representation of capital defendants, and had received training in capital defense. Lazinsky had prosecuted murder cases, as well as either prosecuting or defending approximately twenty Class A and B felony cases.

In preparation for Conner's defense, the two attorneys undertook substantial work and consulted with each other regarding the case. Although Mendez, the attorney who was initially designated as the lead attorney, did not in fact take charge of Conner's case, Lazinsky did fulfill that role. Trial

counsel sought some assistance from the Indiana Public Defender Council and visited Conner on several occasions to discuss his defense.

Counsel timely filed numerous motions, including a motion to suppress Conner's confession, perhaps the most damning piece of evidence against Conner. Other motions included: funding requests for an investigator and a mental health evaluation by a psychiatrist of Conner's choosing, voir dire requests, a motion to dismiss the death penalty information, and at least six motions to restrict the prosecution's presentation of evidence and argument.

Specifically with respect to Conner's mental health, counsel received three reports from three separate evaluations. Two court-appointed doctors, Drs. Hull and Schuster, concluded that Conner suffered from no mental diseases or defects based upon an examination conducted by Dr. Fredrickson. A third mental health examination was later conducted by Dr. King at defense counsels' request, in order to explore any potential defenses. Counsel concluded that Dr. King's report could not support a mental-health defense, and none was pursued at trial.

Counsel also requested and received funds for an investigator. Counsel hired a former homicide detective who had conducted over 150 homicide investigations. The investigator looked into Conner's case and reported back to counsel.

The record also shows that counsels' theory of defense during the guilt phase of Conner's trial was that the prosecution could not prove beyond a reasonable doubt that Conner had committed all three murders. During trial, defense counsel effectively cross-examined the state's witnesses and objected to the admission of evidence in order to create reasonable doubt. Specifically, counsel pointed to factual disputes regarding Voge's murder which suggested that Mark Via, not Conner, may have actually killed Voge. Likewise, counsel also suggested that Moore was actually responsible for Wentland's murder.

At the penalty phase, counsels' strategy was to humanize Conner. Defense counsel argued during opening and closing arguments that although Conner had in fact killed those three men in 1988, he should nonetheless be spared. Conner's mother, step-father, step-sister, girlfriend, and a family friend all testified. Specifically, evidence was presented showing Conner's alcoholism and other drug problems; his use of alcohol on the night of the murders; his background and family issues, including Conner's adoption, his much-loved adoptive father's death early in Conner's life, and his step-father's abuse of alcohol and violent behavior; Conner's stable employment history; his good qualities, including generosity, affection, and concern for his family and friends; and his relatively minor criminal history. Also during the penalty phase, counsel conducted effective cross-examination of the prosecution's witnesses, objected to the admission of evidence, pointed out corrections which needed to be made to the pre-sentence investigation report, and identified mitigating circumstances.

### b. Evidence put forward by Conner at the PCR hearing

During his PCR hearing, which lasted five days, Conner presented evidence in support of his ineffective assistance of counsel claims. In its subsequent order denying post-conviction relief, the Superior Court correctly characterized much of this evidence as "cumulative" to that presented by trial counsel during the guilt and penalty phases. We note here only the portions of the PCR hearing evidence which are both non-cumulative and relevant to his ineffective assistance claim now before this court.

At the PCR hearing, both counsel testified regarding their respective roles in Conner's defense. Regarding the coordination and preparation of Conner's defense, Lazinsky testified that initially there was some confusion as to the

division of responsibility, but that he eventually assumed control of Conner's case. And although the two attorneys never sat down to explicitly divide up tasks, each oversaw certain aspects of Conner's defense. While Mendez oversaw the filing of what he referred to as "stock death penalty motions," Lazinsky personally filed other motions as he saw fit. Mendez was responsible for obtaining an independent psychiatrist to evaluate Conner, and Lazinsky retained a private investigator.

Lazinsky testified that he could not recall whether intoxication was considered as a defense, or whether manslaughter was considered as a lesser-included offense. Mendez testified that he always considered lesser-included offenses, such as manslaughter. Lazinsky also expressly stated that a mental health defense was rejected because there was a lack of substantive evidence to support such a claim. Similarly, Mendez testified that Dr. King was not called to testify because his report was unfavorable.

With respect to counsels' perceptions of their representation of Conner, both testified that they did not feel constrained or hampered by any political considerations in the performance of their duties as trial counsel. Mendez also testified that all funding assistance counsel requested was provided by the court. He further testified that he felt that he had utilized all resources he was aware of in preparation of Conner's defense. Likewise, although Lazinsky noted that he was apprehensive about directing a capital defense, he testified that he believed he pursued all aspects of Conner's defense of which he was aware.

The investigator hired by counsel also testified at the PCR hearing. His investigation had focused on the efficacy and thoroughness of the investigation conducted by the police. He interviewed Detective Stamm and witness Dennis Wolf, and attempted to interview at least four other parties. Specifically, the investigator testified that he had done all

he could think to do with respect to the Conner case. He also indicated that, in his opinion, the case was properly investigated by the police.

Numerous members of Conner's family and friends testified at the PCR hearing. As alluded to earlier, the testimony—detailing Conner's close relationship with his adoptive father, Carl Conner, his immense grief when Carl died, his strained relationship with his step-father, his step-father's drinking and abusive behavior, and Conner's positive characteristics—was duplicative of that presented at trial and during the penalty phase. The only "new" information presented at the PCR hearing with respect to Conner's background was that Conner had learned he was adopted inadvertently, around age twelve, and he was deeply upset by this. Also, viewing the testimony of family and friends at the post-conviction hearing most generously, it shed additional light upon only two aspects of Conner's background: (1) the extent of his step-father's alcoholism and its impact on Conner's home life; and (2) the extent of Conner's own abuse of alcohol beginning at an early age.

Conner also had three experts testify at the PCR hearing. First, Jeanine Jones was qualified as an expert in social work. Jones testified generally that the death of a parent will cause a young child to experience feelings of loss, sometimes accompanied by exaggerated feelings of loneliness and abandonment. Jones further testified that if the deceased parent is soon thereafter replaced by another caregiver, a child will often exhibit animosity towards the new caregiver. Also, Jones indicated that children of alcoholics will often themselves become alcoholics, and will often mirror other behaviors exhibited in their home environment, including violence. Lastly, Jones testified that children who unexpectedly discover that they are adopted often have feelings of loss, rejection, and betrayal, and harbor anger and resentment toward their adoptive parents.

Second, Dr. David Price was qualified as an expert forensic psychologist. He testified generally about the fundamentals of reaching an accurate mental health diagnosis and how the Diagnostic and Statistical Manual ("DSM") is revised over time. Price stated that he reviewed various documents relevant to Conner's case, including Conner's previous mental health evaluations from 1988 (including the reports by Drs. Fredrickson, Hull, Schuster, and King), and personally interviewed Conner on two occasions. Generally, Price criticized the amount of information Drs. Fredrickson, Hull, Schuster, and King relied upon. He offered an opinion that Dr. Fredrickson's evaluation of Conner was incomplete and inaccurate. He also opined that the reports of Drs. Hull and Schuster considered only whether Conner was sane at the time of the murders and whether he was competent to stand trial. In particular, Dr. Price testified that he believed neither doctor considered the broader question of whether there were any other diagnosable mental conditions relevant to mitigation. Last, with respect to Dr. King, Price testified that King "did a more thorough job." Price acknowledged that King requested an electroencephalography ("EEG"), assessed lead levels, and that King's report discussed Conner's background in depth and did, in fact, proffer a diagnosis potentially relevant to mitigation—that Conner had an antisocial personality and mild pathological intoxication. But Price also discounted King's conclusion because King had used the "outmoded" DSM-3, and not the DSM-3R, which was available in 1987. However, Price testified that despite King's usage of the DSM-3, he nonetheless could not call King's diagnosis incorrect.

Price also offered his opinion that Conner "potentially could have [met the criteria for] thirty-one diagnoses . . . found under DSM-3R." Specifically, Price testified that Conner currently has a "delusional disorder," a thought disorder where the subject perceives that he is being perse-

cuted in a grandiose fashion. Price also stated that Conner may have three personality disorders, including an organic personality disorder. Furthermore, Price testified that had Conner suffered from such a disorder in 1988, his behavior would have been irrational, impulsive, and unpredictable—effects which would have been exacerbated by Conner's consumption of alcohol.

Third, a toxicology expert, Dr. Michael Evans, testified that Conner's blood alcohol content at the time of the killings was approximately .19, most likely with a range of .15 and .23. He further testified that when intoxicated, an individual's judgment and logical thought processes are impaired. Specifically, Evans stated that Conner was substantially impaired at the time of the murders.

### c. Analysis of Conner's ineffective assistance claim

Conner asserts that counsels' performance during the guilt phase of his trial was both deficient and prejudicial based upon: (1) the decision to limit investigation into Conner's mental health; (2) the decision to put the state to its burden of proof and to seek an acquittal, instead of presenting the defenses of intoxication or mental illness, or the lesser-included offense of manslaughter; and (3) myriad other alleged errors, including an overall lack of preparation and coordination of his defense; the failure to object to various pieces of evidence, the jury instructions, and the state's closing argument; and the failure to argue in Conner's motion to suppress his confession that the confession was unreliable.

Similarly, Conner asserts that his counsels' performance was deficient and prejudicial during the penalty phase of his trial due to: (1) counsels' decision to limit investigation into his mental health and his family background; (2) the failure to present the mitigating circumstances of intox-

ication or mental illness; and (3) miscellaneous other mistakes, including the failure to object to certain evidence and the jury instructions, as well as counsels' opening and closing arguments.

Since Conner's arguments regarding both phases of his trial are nearly identical, we will address them together, assembled into three general categories. First, we address Conner's allegation that counsels' investigation was inadequate. Second, we consider counsels' choice of guilt and penalty-phase strategy. And third, we briefly discuss the remaining alleged blunders by counsel.

Because, with one exception, we ultimately conclude the post-conviction court reasonably found that counsels' performance was not deficient, we do not address *Strickland's* second requirement, prejudice, with respect to the first two categories. And as to the third category, which is a veritable cornucopia of highly particularized complaints, we find that Conner cannot meet either requirement of *Strickland* with respect to alleged errors in defense counsels' motion practice and alleged failures to object to certain evidence and arguments by opposing counsel; nor can Conner meet the prejudice prong of *Strickland* with respect to counsels' failure to object to and/or proffer alternative jury instructions.

### i.   Investigation into Conner's mental health and family background

With respect to assertions of inadequate investigation as the basis for an ineffectiveness claim, the principal inquiry as to *Strickland*'s deficiency requirement is whether the investigation, which justified or supported counsels' subsequent strategic decisions, was *in and of itself reasonable. See Wiggins*, 539 U.S. at ___, 123 S. Ct. at 2536. In assessing counsels' investigation, their performance must be reviewed objectively, measured against "'reasonableness

under prevailing professional norms.'" *Id.* (quoting *Strickland*, 466 U.S. at 688).

Conner relies primarily upon the Supreme Court's recent *Wiggins* decision to support his argument that counsels' investigation was objectively unreasonable. In *Wiggins*, the Court held that investigation prior to the defendant's sentencing, with respect to both its scope and depth (i.e., experts consulted, extent of research into known mitigating circumstances), fell below established professional standards of conduct, including the American Bar Association's Guidelines for capital defense work. *Id.* at 2536-38.

Defense counsel's investigation in *Wiggins* relied upon three sources. First, a psychologist determined that the defendant had an IQ of 79, problems coping with difficult situations, and exhibited features of a personality disorder. Second, the presentence investigation report included a one-page account of the defendant's personal history, noting his "misery as a youth," quoting his description of his own background as "disgusting," and observing that he spent most of his young life in foster care. Third, counsel obtained the Baltimore City Department of Social Services ("DSS") records documenting the defendant's various placements in the foster care system. *Id.* at 2536. Although funds were allocated by the state court to retain a forensic social worker, no further inquiries were made, and no social history was compiled by counsel. In response to the ineffectiveness claim, the state of Maryland asserted that counsel's limited pursuit of mitigating evidence and counsel's *ipso facto* decision not to present any mitigating evidence at sentencing (instead arguing that the defendant was not directly responsible for the murder) was a tactical decision. *Id.* at 2533-34.

But the Supreme Court found that counsel deficiently abandoned their inquiry into the defendant's background "after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 2537. The Court reasoned that the DSS records alerted counsel to numerous

issues (like his mother's alcoholism and his foster system record) in the defendant's background which merited additional investigation because such was necessary "to mak[e] an informed choice among possible defenses." *Id.* No evidence was uncovered, the Court emphasized, to suggest that a mitigation case would have been counterproductive. And counsel never abandoned the possibility of a mitigation defense, even entreating the jury at sentencing to consider "who [the defendant] is" and presenting evidence about the rehabilitation prospects of the defendant, thereby necessitating counsel to "develop the most powerful mitigation case possible." *Id.* at 2530.

Moreover, at the *Wiggins* PCR hearing, a licensed social worker certified as an expert by the court testified that the defendant had suffered severe sexual and physical abuse at the hands of his mother and while in the care of a series of foster parents—a fact the state reviewing court erroneously found to have been included in the DSS report. *Id.* at 2539. In addition, the expert testified about the extreme conditions the defendant endured first in his alcoholic mother's home (including being abandoned for days and being forced to beg for food and eat paint chips and garbage, an incident where the defendant's hand was held against a hot stove burner, and repeated instances where the mother had sex with men while the defendant slept in the same bed), then in the homes of various foster parents (repeated physical abuse, rapes, gang-rape, and molestation), and lastly as a runaway. *Id.* at 2532-33. The Court inferred that "[h]ad counsel investigated further, they may well have discovered the sexual abuse [and other extreme conditions] later revealed during state post[-]conviction proceedings." *Id.*at 2537. Hence, the Court concluded that counsel's failure to investigate thoroughly was the result of inattention, not reasoned strategic judgment, and held that the Maryland court's determination that counsel's performance had not been deficient under *Strickland* was unreasonable. *Id.* at 2537, 2539.

Conner's case is easily distinguishable. First, counsel did investigate both Conner's mental history and family background. In addition to evaluations conducted by two court-appointed psychiatrists, which found Conner both competent and sane, counsel obtained funding for an examination by a psychiatrist of their own choosing, Dr. King. Dr. King subsequently did evaluate Conner. Counsel considered Dr. King's findings and concluded that the report did not conclusively support a mental-health defense (the wisdom of which we discuss in more detail below).

Second, unlike counsel in *Wiggins*, who focused upon challenging the defendant's guilt during the penalty phase and failed to elicit more than a scintilla of mitigating evidence despite having promised the jury that evidence about the defendant's difficult life would be presented, the focus of Conner's counsel throughout the penalty phase was mitigation—including counsels' opening statement, presentation of evidence, and closing statement.

Third and relatedly, Conner's counsel investigated and then presented extensive testimony during the penalty phase regarding Conner's painful family history, alcohol abuse, adoption, and Conner's positive qualities. And as we have previously held, trial counsel is not required to investigate the defendant's past with the thoroughness of a biographer. *Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir. 1996).

Fourth, unlike *Wiggins*, where the PCR hearing revealed extensive physical and sexual abuse which the court found was unknown to counsel at sentencing but which likely would have been discovered by counsel had they not shirked their investigatory responsibilities, Conner presented very little evidence at the PCR hearing which was materially unknown to counsel. With respect to the "new" evidence which Conner did introduce at the hearing— regarding the significant impact of Conner's discovery of his adoptive

status, the extent of Conner's step-father's alcoholism, and his own use of alcohol—we cannot consider counsel's failure to uncover it deficient performance since these facts were at least referenced and/or generally presented to the jury during the penalty phase by many of the same testifying witnesses.[6]

In summary, we cannot say that the post-conviction court unreasonably held that counsels' investigation with respect to both the guilt and penalty phases of Conner's trial did not fall below prevailing professional standards.

### ii.  Strategic choices

#### (A)  Guilt phase

Counsel challenged the state to meet its burden of proof at trial and sought an acquittal, in lieu of pursuing a mental disease or defect or intoxication defense. Counsel also opted not to advocate for the lesser-included offense of manslaughter with respect to the killings of Wentland and Moore.

Consistent with counsels' strategy, counsel pointed to eyewitness testimony that suggested Moore was actually responsible for Wentland's murder and presented factual

---

[6]  And even if it was deficient performance, we could not conclude that the PCR court's determination that Conner did not meet the prejudice prong of *Strickland* was outside the parameters of permissible legal opinion because (1) again, this information was in fact presented, or at least introduced, to the jury, albeit in less detail, at the penalty phase; and (2) the information is not as shockingly extreme or graphic in nature as that in *Wiggins*. As we stated in *Eddmonds v. Peters*, 93 F.3d 1307, 1322 (7th Cir. 1996), "a few more tidbits from the past. . . [thrown] onto the scale would not have tipped it in [Conner's] favor."

disputes regarding Voge's murder, indicating that Mark Via may have been the killer. Clearly, once counsel opted to challenge whether the state could prove beyond a reasonable doubt that it was Conner who had killed Wentland and Voge, then counsel would have been hard-pressed to concomitantly assert with any degree of legitimacy that, assuming it actually was Conner who committed these two murders, then he should be held less accountable because of mental disease or defect, intoxication, or because he was acting with "sudden heat" (one basis for the lesser offense of manslaughter, Ind. Code § 35-42-1-3 (1989); *see*, *e.g.*, *Olive v. State*, 696 N.E.2d 381, 382-83 (Ind. 1998)).

Moreover, we cannot say that the Indiana Supreme Court's[7] assessment that "counsel was not outside their bounds of discretion in deciding not to invoke an intoxication defense when, under the facts of this case and the law of Indiana, this defense was not likely to be effective[,]" 711 N.E.2d at 1250, was not at least minimally consistent with the facts and circumstances of this case, or was not at least one of several equally plausible legal conclusions.[8]

---

[7] Here, we review the decision of the Indiana Supreme Court, as opposed to a ruling of the PCR court, because while Conner clearly raised this argument before the PCR court, we cannot find any ruling of the PCR court expressly addressing the issue.

[8] It should also be noted that the trial court did, in fact, sua sponte instruct the jury as to intoxication. However, this is largely irrelevant to our analysis of whether counsel was deficient in foregoing argument and a more extensive presentation of evidence at trial as to intoxication based upon an assessment that such a defense would not likely be successful under Indiana law. Moreover, that the jury convicted Conner on all three murder counts notwithstanding the court's intoxication instruction strongly indicates that even if it was error for counsel not to proffer an intoxication defense, Conner suffered no prejudice from this failing.

(continued...)

With respect to a possible mental disease or defect defense, counsel determined, well within the scope of reasonable professional strategic judgments, that Dr. King's evaluation on its face was not conclusively favorable to Conner and moreover, given the assessments of the three doctors who also evaluated Conner and found no mental health problems, a mental-health defense, if pursued, would open the door to potentially severely damaging rebuttal testimony from the state. Even the psychologist who testified on Conner's behalf at the PCR hearing, Dr. Price, could not state that Dr. King's evaluation was incorrect. Moreover, Dr. Price's diagnosis was consistent with that of Dr. King's, although it was more expansive. Given the quantum of evidence available to counsel at the time of trial, which included three reports indicating that Conner suffered from no mental disease or defect, and considering that Conner's own expert at the PCR hearing could not point to any errors in the report submitted by Dr. King, counsel were justified in relying upon Dr. King's report and in rejecting a mental disease or defect defense.

Next we address counsels' failure to advocate for the lesser-included offense of manslaughter with respect to the killings of Wentland and Moore.[9] Under Indiana law, sudden heat requires "sufficient provocation to engender . . . passion." *Olive*, 696 N.E.2d at 382. Sufficient provocation is demonstrated by "anger, rage, sudden resentment, or terror

---

[8]  (...continued)

As to Conner's assertion that the intoxication instruction as given by the trial court was legal error, we address (and dismiss) later in this opinion the many alleged problems with the jury instructions he provides as a basis for his ineffectiveness claim.

[9]  The lesser offense of manslaughter based upon sudden heat was a factual impossibility with respect to Voge's killing, since he was shot by Conner while laying on a couch, and no prior argument had transpired.

that is sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection." *Id.* at 383.

The record evidence does not even remotely indicate that Conner was acting with "sudden heat" when he killed Wentland. Evidence showed that it was Moore, and not Conner, who had been arguing with Wentland. Wentland attempted to flee the car and called for help, but he was pursued on foot by Conner who eventually grabbed him, beat, and stabbed him. These facts are not at all conducive to a "sudden heat" argument, *see*, *e.g.*, *Ellis v. State*, 508 N.E.2d 790, 791 (Ind. 1987) (rejecting the contention that there was evidence of sudden heat where defendant not only fatally stabbed the victim, but continued to attack him as he lay on the ground). Consequently, the Indiana Supreme Court[10] did not unreasonably determine that trial counsels' decision to forego any request for a manslaughter instruction as to Wentland's murder did not fall below prevailing professional standards.

However, with respect to Moore's killing, we do find that the Indiana Supreme Court unreasonably held that Conner failed to demonstrate that trial counsels' decision to forego argument in support of manslaughter as a lesser-included offense was not deficient. The irrefutable facts presented at trial by the state of Indiana foreclosed any argument disputing that Conner killed Moore. And not surprisingly, at trial, Conner's counsel did not attempt to cast doubt upon Conner's responsibility for this crime. In essence, given that counsel—within the scope of their professional strategic judgment, *see supra*—opted to forego an intoxication or

---

[10] Again, *see supra* note 7, we review the decision of the Indiana Supreme Court because, while Conner did indeed raise this argument before the PCR court, no ruling of the PCR court expressly addressed the issue.

mental health defense, no discernible theory of defense as to Moore's killing was presented at trial. Hence, it was deficient for defense counsel not to advocate for manslaughter based upon "sudden heat," if such an argument was at all plausible.

Moore was killed, according to Conner, during the course of a heated argument between Conner and Moore regarding the appropriate course of action for the two to take following Wentland's murder. Moore wielded a knife at some point during the confrontation. And indisputably, Conner had been drinking heavily prior to the killings. Clearly, had defense counsel requested a "sudden heat" manslaughter instruction, the trial court would have been legally obligated to so instruct the jury. *See, e.g.*, *Griffin v. State*, 644 N.E.2d 561, 562 (Ind. 1994) (stating that the evidentiary standard used to determine whether a defendant charged with murder is entitled to an instruction on voluntary manslaughter is "not a high one: the instruction is justified if there is any appreciable evidence of sudden heat") (quotation omitted). Therefore, counsels' failure to do so was deficient, Conner met his burden with respect to *Strickland's* first requirement, and the Indiana Supreme Court's contrary determination is objectively unreasonable.

Notwithstanding this determination, we also find that the Indiana Supreme Court reasonably concluded that Conner did not meet his burden as to *Strickland's* second requirement—that he was prejudiced by counsels' aforementioned unprofessional error. In short, Conner failed to demonstrate that the jury would not have convicted him of murder even if counsel had proffered a "sudden heat" manslaughter instruction and if the trial court had given the instruction in its charge to the jury. The prosecution put forth overwhelming evidence showing that Moore's rationality and self-preservation impulse were not overcome by emotion on the day of the killings. For instance, when Conner told his employer that he "had to off [Moore]" immediately following

the shooting, his demeanor was not that of someone over-come by rage, anger, or any other emotions. In addition, Conner took numerous steps to cover up his crimes, includ-ing enlisting friends to help dispose of Moore's body and then fleeing the state. Even if we disagreed with the state Supreme Court's determination that Conner failed to meet his burden to show a probability undermining confidence in the outcome, certainly the evidence presented at trial was such that we cannot now say that this ruling was outside the boundaries of permissible differences of legal opinion.

In summary, aside from our discussion of counsels' failure to advocate for the lesser-included offense of manslaughter with respect to Moore's killing, the PCR court's and Su-preme Court's conclusions that counsels' trial strategy was not deficient is at least minimally consistent with the facts and circumstances of this case, and hence, is not unreason-able. And regarding counsels' deficiency with respect to Moore's killing, we find that the Indiana Supreme  Court did not unreasonably hold that Conner failed to demon-strate he was prejudiced by counsels' failing.

### (B)   Penalty phase

Turning next to the penalty phase, as explained in detail above, counsels' strategy was to "humanize" the defendant. This was a legitimate strategy in a difficult case. For the same reasons we noted above, counsel did not fall below minimum prevailing professional standards when counsel determined not to pursue mental disease or defect as a mitigating factor. And regarding intoxication and Conner's family life, the record shows that counsel in fact offered extensive evidence of his alcohol dependency, his consump-tion of alcohol on the day of the murders, and detailed descriptions of his background from numerous witnesses. Conner's argument as to these two aspects of counsels' penalty-phase presentation amounts to an assertion that

counsel did not present *enough* mitigating evidence. But we must be particularly wary of such arguments, which essentially come down to a matter of degrees, and are not well-suited to judicial second-guessing. *See Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001). In short, we find the PCR court reasonably determined that Conner's counsel were not deficient in pursuing a "humanizing" or mitigation strategy during the penalty phase, which included evidence of intoxication and his family background, but omitted mental health evidence.

### iii.  Other complaints

Conner asserts in summary fashion all sorts of errors by counsel as to motions practice, the failure to object to certain testimony and portions of the state's guilt and penalty-phase closing arguments, as well as the failure to object to or proffer alternative jury instructions at both phases of trial. To put it simply, with respect to the complaints regarding motions practice and alleged failures to object to certain evidence and opposing counsel's arguments, it is impossible for us to say that the PCR court unreasonably held that Conner failed to meet his burden to show either counsels' deficiency or, even assuming error, any discernable prejudice. *See, e.g.*, *United States v. Mutuc*, 349 F.3d 930, 935 (7th Cir. 2003) ("[c]onsidering that a motion in limine is sought to aid counsel in formulating his trial strategy, the decision regarding whether to file such a motion is clearly part of the process of establishing trial strategy," and because strategy decisions are presumed sound, simply the failure to make a motion or the affirmative filing of a motion, without more, is insufficient to demonstrate deficiency); *United States v. Hernandez-Rivas*, 348 F.3d 595, 601 (7th Cir. 2003) (stating "where an attorney's mistake resulted in the admission of evidence that would have otherwise been suppressed, the outcome of the trial does not become any less reliable") (citing cases).

However, we will address at greater length the extensive number of alleged errors by counsel vis à vis both the guilt and penalty-phase jury instructions (i.e., complaints that counsel failed to tender instructions to the court and that counsel failed to object to allegedly improper instructions used to charge the jury). Critically, the propriety of the jury instructions was directly raised, considered, and subsequently rejected in Conner's post-conviction attack. The state Supreme Court[11] specifically found that (1) because Conner could have challenged the jury instructions in his direct appeal, but did not, these claims were forfeited, except to the extent that a fundamental error occurred; and (2) the instructions as given did not, in toto, amount to fundamental error. *Conner II*, 711 N.E.2d at 1246-47. In his habeas petition, Conner again challenged various portions of the guilt and penalty-phase jury instructions, including every error now alleged before this court. *Conner III*, 259 F. Supp. 2d at 760-61. The district court rejected all these claims, holding: (1) the claims were procedurally defaulted for habeas purposes because Conner failed to raise them in his direct appeal, *Id.* at 760 (citing *Conner II*, 711 N.E.2d at 1246); (2) neither exception to procedural default applied; and (3) therefore, the court need not consider whether, on the merits, Conner was entitled to a writ based on the jury instructions. *Id.* at 761.

In the instant appeal, perhaps understanding the reality of procedural default, Conner does not challenge the portion of the district court's holding which addressed his direct challenges to the jury instructions. Instead, Conner has shoe-horned these challenges into his ineffective assistance of counsel claims, and apparently hopes to have us consider his various protestations as to the propriety of the jury instructions on the merits, despite procedural default. We decline to do so.

---

[11] For the same reasons we laid out in note 7, *supra*, here again we focus our analysis on the Indiana Supreme Court's rulings.

Furthermore, because the *Strickland* standard and the one exception to procedural default potentially applicable to Conner's habeas petition both necessitate a finding of prejudice, even if the merits of Conner's ineffective assistance of counsel claim are addressed, there is no reason to depart from the district court's (unappealed) determination below that Conner suffered no prejudice from any alleged errors in the guilt or penalty-phase jury instructions. As we explained many pages ago, when a claim is procedurally defaulted, a federal court can nonetheless consider the claim on its merits if a habeas petitioner demonstrates either (1) cause and actual prejudice; or (2) a colorable claim of actual innocence (a basis not readily at issue here, *see Conner III*, 259 F. Supp. 2d at 761). *See*, *e.g.*, *Coleman*, 501 U.S. at 750. In *Conner III*, the district court bypassed an analysis of the "cause" requirement, expressly held that "[t]he instructions to which Conner objected in *Conner II*, when viewed in conjunction with other pertinent instructions, did not misinform the jury of its duty nor misstate the law[,]" and concluded—echoing the state Supreme Court's similar conclusion—that Conner therefore had not shown prejudice stemming from the guilt or penalty-phase jury instructions. 259 F. Supp. 2d at 761.

Jury instructions are properly considered in their entirety whether alleged as the basis for overcoming procedural default, or as the basis for an ineffective assistance of counsel claim. *See Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973), *cited in Perry v. McCaughtry*, 308 F.3d 682, 689 (7th Cir. 2002), *and Conner III*, 259 F. Supp. 2d at 761. Therefore, the prejudice analysis laid out by the district court with respect to procedural default is herein dispositive as to Conner's (in)ability to make the requisite showing of prejudice under *Strickland*, absent some salient argument by Conner to the contrary. Conner proffers no such argument, instead simply lists the guilt and penalty-phase jury instructions he takes issue with, and then conclusively

asserts that the instructions are both unconstitutional and prejudicial. We are unpersuaded by this, and find no reason to upset the district court's conclusion that, when viewing the instructions as a whole, Conner failed to demonstrate that he suffered any prejudice from the alleged errors in the instructions (irrespective of whether we would attribute such errors to counsel).

In conclusion, we do not agree with Conner that counsels' performance was deficient in any of the respects addressed above—motions practice, the failure to object to evidence or opposing counsel's arguments, or the failure to object to or proffer alternative jury instructions. Furthermore, even if we did conclude that counsel was deficient in any of the afore-mentioned ways, we still could not deem the PCR court's and the Indiana Supreme Court's conclusions—that Conner did not demonstrate that all these errors created a reasonable probability undermining confidence in the outcome of the trial or penalty phases—unreasonable.

We therefore agree with the district court's denial of habeas relief with respect to Conner's ineffective assistance of trial counsel claim, finding that counsel was not deficient in either their investigation or choice of strategy, holding that counsel's alleged failures to object to evidence and argument were not unprofessional errors or the cause of prejudice to Conner, and further concluding that Conner suffered no prejudice from any alleged errors in either the guilt or penalty-phase jury instructions.

## III.  Conclusion

To summarize, the district court's denial of Conner's petition for a writ of habeas corpus as to (1) the admissibility of his confession; (2) the ex parte jury communication; and (3) the assistance of trial counsel is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*